*In the Matter of the Honorable Marc Knapp, Judge of the Orphans' Court for Anne Arundel County*, JD No. 1, September Term, 2025, Opinion by Booth, J.

**JUDICIAL DISCIPLINE – SANCTIONS – REMOVAL –** The Supreme Court of Maryland removed from office a judge serving on the Orphans' Court for Anne Arundel County who engaged in egregious misconduct that was prejudicial to the administration of justice. The Court concluded that the judge violated numerous provisions of the Maryland Code of Judicial Conduct ("MCJC")—18-101.1 (Compliance with the Law); 18-101.2 (Promoting Confidence in the Judiciary); 18-102.3 (Bias, Prejudice, and Harassment); 18-102.5 (Competence, Diligence, and Cooperation); 18-102.8(b) (Decorum, Demeanor, and Communications); and 18-102.16 (Cooperation with Disciplinary Authorities).

These violations arose from the judge's interference with the operations of the Orphans' Court, including his: (1) recording judicial deliberations without his colleagues' consent; (2) knowingly and willfully attempting to destroy evidence in the presence of law enforcement officers; (3) repeatedly failing to maintain patient, dignified, and courteous conduct toward judicial colleagues and court staff in and outside of the courtroom; (4) engaging in conduct that created a perception of bias against women and persons of color; (5) repeatedly making disparaging comments about the Judiciary, Orphans' Court and a judicial colleague to the public and the media; and (6) failing to cooperate with the Judicial Disabilities Commission's investigative process.

The Supreme Court concluded that the judge's egregious conduct in intentionally deleting audio recordings in the presence of law enforcement officers who were called to investigate a complaint that he was recording his colleagues during judicial deliberations was a sufficient basis to warrant his removal from office. Such conduct is fundamentally incompatible with judicial office and erodes the public confidence and in trust in the Judiciary. In addition to this blatant violation, the Court also considered the conduct upon which it found violations of the MCJC, as well as mitigating factors, and concluded that removal was the only disposition sufficient to preserve the integrity, independence, and impartiality of the Judiciary and assure the public that the Judiciary does not condone such judicial misconduct.

Maryland Commission on Judicial Disabilities
Case Nos.: CJD 2024-033, CJD 2024-034,
   CJD 2024-035, CJD 2024-040, CJD 2024-0046
   CJD 2024-047, CJD 2024-052, CJD 2024-068
Argued: June 4, 2026

IN THE SUPREME COURT

OF MARYLAND

---

JD No. 1

September Term, 2025

---

IN THE MATTER OF THE HONORABLE
MARC KNAPP, JUDGE OF THE ORPHANS'
COURT FOR ANNE ARUNDEL COUNTY

---

Watts,
Booth,
Biran,
Gould,
Eaves,
Harrell, Glenn T.
   (Senior Justice, Specially Assigned)
McDonald, Robert N.
   (Senior Justice, Specially Assigned)

JJ.

---

Opinion by Booth, J.

---

Filed: July 17, 2026

Pursuant to the Maryland Uniform Electronic Legal
Materials Act (§§ 10-1601 et seq. of the State
Government Article) this document is authentic.



Gregory Hilton, Clerk

"In Maryland, judges are expected to abide by certain ethical standards, set forth in the Maryland Code of Judicial Conduct [], to ensure they conduct themselves in a manner consistent with preserving the integrity of the judiciary." *In re Nickerson*, 473 Md. 509, 512 (2021) (footnote omitted). When a judge's conduct falls short of those standards, the Maryland Constitution vests the Maryland Commission on Judicial Disabilities (the "Commission") with authority to investigate alleged instances of judicial misconduct and, where appropriate, recommend that this Court take appropriate disciplinary action, up to and including removal from office. Md. Const. art. IV, § 4B; *In re Ademiluyi*, 488 Md. 45 (2024).

This case concerns Marc Knapp, a judge of the Orphans' Court for Anne Arundel County, who was elected to that position by the qualified voters of Anne Arundel County in November 2022.[1] On February 24, 2025, Investigative Counsel charged Judge Knapp with having engaged in sanctionable conduct that violated multiple provisions of the Maryland

---

[1] Maryland's Orphans' Courts are courts of record established by Article IV, Section 1 of the Maryland Constitution. These courts exercise jurisdiction over the administration of estates, certain guardianship and protective proceedings, and related matters. Md. Code Ann., Est. & Trusts ("ET") §§ 2-102, 13-105. The Maryland Constitution requires only that Orphans' Court judges be Maryland citizens and residents of their jurisdiction for at least twelve months before their election. Md. Const. art. IV, § 40. By statute, different jurisdictions have different requirements for serving on the Orphans' Court for that jurisdiction. For example, in Baltimore City, Baltimore County, and Prince George's County, Orphans' Court judges are required to be members of the Maryland bar, and a single judge may preside over and decide matters alone. By contrast, in Anne Arundel County, as relevant to this proceeding, the judges are not required to be Maryland attorneys. The judges make decisions as a three-judge panel, requiring that at least two judges concur for the court to take any official action, thus constituting a collegial decision-making process. ET § 2-106(a)(3).

Code of Judicial Conduct ("MCJC").[2] Investigative Counsel amended the charges on May 1, 2025, and alleged that Judge Knapp committed sanctionable conduct in violation of Maryland Rules 18-101.1 (Compliance with the Law); 18-101.2 (Promoting Confidence in the Judiciary); 18-101.3 (Avoiding Lending the Prestige of Judicial Office); 18-102.3 (Bias, Prejudice, and Harassment); 18-102.5 (Competence, Diligence, and Cooperation); 18-102.8 (Decorum, Demeanor, and Communications with Jurors); 18-102.10 (Judicial Statements on Pending and Impending Cases); 18-102.16(b) (Cooperation with Disciplinary Authorities); and 18-103.1(d) & (e) (Extra-Official Activities in General). On June 5, 2025, Judge Knapp, through counsel, filed a response to the amended charges.

The Commission held a public hearing over the course of three days in October 2025. At the hearing, Investigative Counsel called 12 witnesses and entered 27 exhibits. Judge Knapp testified on his own behalf, called two character witnesses, and entered three exhibits.[3]

---

[2] The Maryland Code of Judicial Conduct ("MCJC") is codified in Chapter 100 of Title 18 of the Maryland Rules. "The substantive provisions and much of the MCJC are based in large part on the 2007 Model Code of Judicial Conduct proposed by the American Bar Association (ABA Model Code)." Md. Rule 18-100.1(a) (citation modified). The MCJC is divided into five parts: introductory material, judicial integrity and the avoidance of impropriety, the performance of judicial duties, extrajudicial activities, and political activity. *See* Committee Note to Md. Rule 18-100.1(a). This structure "conforms generally" to the ABA Model Code. *Id.* Likewise, the Rules are numbered in parallel to the ABA Model Code. "Thus, for example, ABA Rule 1.1 (Compliance with the Law) is Maryland Rule 18-101.1, which is also captioned 'Compliance with the Law.'" *Id.*

[3] At the Commission hearing, Investigative Counsel called the following witnesses: Deborah Cheek (Auditor and Assistant Court Administrator for the Anne Arundel County Register of Wills); the Honorable David Duba (former Orphans' Court judge for Anne Arundel County); Corporal Juan Fuentes (Anne Arundel County Police Department); Cody Henson (security guard for the Watkins Security Agency stationed at the Anne Arundel County Orphans' Court); Georges-Phillip Hetherington (former law clerk for the Anne

2

On March 9, 2025, the Commission issued a unanimous decision in which it made extensive findings of fact, and found, by clear and convincing evidence, that Judge Knapp committed sanctionable conduct as defined by Maryland Rule 18-402(m)(1).[4]  In total, the Commission concluded that Judge Knapp violated the following Maryland Rules: 18-101.1; 18-101.2; 18-102.3; 18-102.5; 18-102.8(b); and 18-102.16.  The Commission found insufficient evidence to sustain charges under Rules 18-101.3, 18-102.10, and 18-103.1.

By unanimous vote, the Commission recommended that Judge Knapp be removed from office.  In accordance with Maryland Rule 18-435(c), the Commission referred the matter to this Court for final disposition.

Judge Knapp filed 24 exceptions to the Commission's findings of fact, and five exceptions (including multiple subparts) to its legal conclusions, and urged this Court to adopt a lesser sanction.  The Commission filed a response to Judge Knapp's exceptions.

---

Arundel County Orphans' Court); Officer Brenden King (Anne Arundel County Police Department); Detective Michael Krok (forensic digital examiner for the Anne Arundel County Police Department); Corporal Joseph Mastros (Anne Arundel County Police Department); Eunice Owns (County Administrator for the Anne Arundel County Register of Wills); Tameka Smith (Chief Deputy for the Anne Arundel County Register of Wills); and Sergeant Heather Whittaker (Anne Arundel County Police Department).

In addition to testifying, Judge Knapp called two character witnesses: Trevor Kiessling, Esquire and Audrey McFarlane, Professor at the University of Baltimore School of Law.

[4] "'Sanctionable conduct' means misconduct while in office, the persistent failure by a judge to perform the duties of the judge's office, or conduct prejudicial to the proper administration of justice.  A judge's violation of the provisions of the Maryland Code of Judicial Conduct, promulgated by Title 18, Chapter 100 may constitute sanctionable conduct."  Md. Rule 18-402(m)(1).

We held a hearing on June 4, 2026, and thereafter, we entered a per curiam order in which we concluded that Judge Knapp committed one or more of the violations determined by the Commission. In accordance with Article IV, § 4B(b)(1) of the Constitution of Maryland, and based upon the egregious nature of the misconduct in this case, the most appropriate disposition was to remove Marc Knapp from office as a judge of the Orphans' Court for Anne Arundel County. We now explain the basis for our order.

# I

## Judge Knapp's Threshold Allegations of Error

In addition to his exceptions to the Commission's findings of fact and conclusions of law, Judge Knapp raises two threshold legal issues related to prehearing rulings by the Commission. First, he asserts that the Commission erred in denying his request to consolidate his hearing with a hearing on his colleague, Chief Judge Vickie Gipson's pending disciplinary charges.[5] Second, he contends that the Commission should have excluded from the evidence, and therefore should not have considered, a recording extracted from his cell phone, based upon his contention that the cell phone was unlawfully seized by law enforcement officers. We address each issue before turning to Judge Knapp's exceptions.

### A. Commission's Denial of Judge Knapp's Motion to Consolidate

Before the Commission, Judge Knapp filed a "Motion for Appropriate Relief (Consolidation)" in which he asserted that a fair reading of the charges against both Judge Knapp and Chief Judge Gipson involve "interpersonal conflict[s] with each other." Although

---

[5] *See In Re The Honorable Vickie Gipson*, Supreme Court of Maryland, JD No. 2, September Term, 2025.

Judge Knapp acknowledged that there was "no specific rule concerning joinder in the procedural rules that govern hearings before the Commission[,]" he cited to the joinder rules that govern criminal and civil actions generally, Maryland Rules 4-253 and 2-503, as offering "significant guidance." Judge Knapp posited that because much of the alleged misconduct arose from the "same act or transaction" or "the same series of acts or transactions" with Chief Judge Gipson and other court-related personnel, and "a common question of law or fact or a common subject matter[,]" the cases should be consolidated for purposes of the Commission's hearing. Judge Knapp also asserted that considerations of "judicial economy" also favored consolidation. Investigative Counsel opposed the request for joinder.

On April 28, 2025, the Commission Chair, the Honorable Anne K. Albright, of the Appellate Court of Maryland, entered an order denying Judge Knapp's motion to consolidate. In the order, the Chair concluded that, even if the Commission's charges against multiple judges could be consolidated (an issue that the Chair concluded the Commission did not need to decide) and there was some factual overlap between the allegations against the two judges such that there might be some efficiency gained by having a consolidated hearing, she was not persuaded that "efficiency (if any) outweighs the danger of confusion" or a danger to Chief Judge Gipson's rights, "among other challenges that may arise from a consolidated hearing[.]"

We review the Chair's decision to deny the motion to consolidate for an abuse of discretion. *See, e.g.*, *Conyers v. State*, 345 Md. 525, 556 (1997) (explaining that, in the criminal context, the balancing test for joinder is a discretionary function and a reviewing court will only reverse a trial judge's decision if it was a clear abuse of discretion). We

5

conclude that there was no abuse of discretion, and therefore, overrule Judge Knapp's exception arising from the Chair's decision on the motion to consolidate. As Judge Knapp acknowledges, there is no rule that speaks to consolidation in the context of judicial disciplinary proceedings. The Chair determined, among other things, that any potential judicial economy was outweighed by the potential for confusion, and the right of confidentiality. In undertaking a balancing analysis, the Chair gave a reasoned and thoughtful explanation for her denial of the motion, and we overrule Judge Knapp's exception.

### B. Commission's Decision To Admit Audio Recording Recovered by Law Enforcement

Prior to the Commission's hearing, Judge Knapp filed a motion in limine, in which he sought to exclude admission of both an audio recording that he made of judicial deliberations among himself and his colleagues on June 4, 2024,[6] and testimony from law enforcement about that recording and its subsequent seizure. On October 8, 2025, the Commission denied Judge Knapp's motion to exclude the recording and the officers' testimony regarding Judge Knapp's attempt to destroy evidence in their presence.

As we will discuss in more detail below, some of the charges against Judge Knapp related to allegations that he was recording conversations and discussions among himself

---

[6] In his motion in limine, Judge Knapp sought to exclude a recording that he referenced as being made on June 11, 2024. As the Commission points out in a legal memorandum responding to Judge Knapp's arguments on this issue, the June 11 recording was not admitted into evidence against Judge Knapp. For purposes of considering Judge Knapp's exception, we will assume that his motion in limine sought to exclude the audio recording of the judicial deliberations among the judges on June 4, 2024—the audio recording that was, in fact, admitted into evidence.

6

and other individuals without their consent, and to his subsequent deletion of evidence pertaining to those recordings in the presence of law enforcement officers, who had responded to a 911 call to investigate the allegations.

In criminal proceedings against Judge Knapp that are not relevant to the charges in this proceeding, the Circuit Court for Anne Arundel County granted Judge Knapp's motion to suppress the cell phone. Thereafter, Judge Knapp filed a motion in limine to exclude the same evidence from the Commission's hearing, arguing that the suppression ruling in the criminal court resolved the issue in his favor. The Commission denied Judge Knapp's motion, explaining that the court's acceptance of Judge Knapp's argument in his criminal case and its resultant application of the Fourth Amendment's exclusionary rule did not extend to the introduction of the same evidence in a Commission hearing. Judge Knapp believes this ruling was in error.

We review the Commission's denial of Judge Knapp's motion to suppress based on the facts in the record and in the light most favorable to Investigative Counsel as the prevailing party on the motion. *See Grant v. State*, 449 Md. 1, 14 (2016). Where relevant, we review legal questions de novo; however, we do not disturb the Commission's factual findings unless they are clearly erroneous. *Id.* at 14–15.

"Where evidence is obtained in violation of an individual's Fourth Amendment rights, the exclusionary rule provides that the evidence will be inadmissible at trial." *In re Russell*, 464 Md. 390, 407 n.10 (2019) (citing *United States v. Janis*, 428 U.S. 433, 446 (1976)). The "prime purpose of the [exclusionary] rule, if not the sole one, is to deter future unlawful police conduct." *Janis*, 428 U.S. at 446 (citation omitted). "As with any remedial

7

device, the application of the rule has been restricted to those areas where its remedial objectives are thought most efficaciously served." *In re Russell*, 464 Md. at 407 n.10 (quoting *Janis*, 428 U.S. at 447). The U.S. Supreme Court explained in *United States v. Janis*, 428 U.S. 433 (1976), that outside the criminal context, the application of the exclusionary rule depends upon a balancing of the rule's likely deterrent effect against the societal costs of excluding reliable evidence. *See id.* at 447–54 (declining to extend the exclusionary rule to civil proceeding).

We adopted the *Janis* balancing test when we addressed the applicability of the exclusionary rule in public discharge hearings—a matter of administrative procedure. *See Sheetz v. Mayor & City Council of Baltimore*, 315 Md. 208 (1989). In *Sheetz*, we explained that the deterrent benefits of the exclusionary rule are "minimal" in the context of discharge proceedings and therefore the exclusionary rule "does not generally apply" in such cases. *Id.* at 215. However, "as a matter of Maryland administrative law," we noted that we were "unwilling to hold that such evidence is always admissible." *Id.* We held that, in the context of a civil administrative discharge proceeding, such evidence is inadmissible "where the defendant establishes that the police were improperly motivated to illegally seize evidence to benefit civil proceedings." *Id.* at 216.

We set forth a nonexclusive list of factors that a court should consider in determining the motivation behind an improper search and seizure: (1) whether, at the time of the illegal search, the police were aware of the potential effect of using such evidence in civil proceedings; (2) whether the severity of the consequences of civil proceedings roughly paralleled or exceeded that of the criminal proceedings; (3) whether a reasonable officer

8

would have believed the search to be a proper one; (4) whether there was an agreement between the police and another party to pursue the investigations which led to the improperly obtained evidence; and (5) whether the police had a special interest in the case. *Id.* at 216.

Applying the factors outlined in *Sheetz*, the Chair found that there was no evidence in the record that the police were aware of a potential judicial disabilities case or any civil matter in which the seized evidence might be introduced. The Chair recognized that any potential sanctions it may recommend be levied against Judge Knapp were far less severe than the consequences he faced in the criminal case. With respect to any suppression ruling made by the circuit court, the Chair determined that "a reasonable officer would have believed the search to be a proper one," and concluded that "collateral estoppel [did] not prevent the Commission from considering" the lawfulness of the search "anew." The Chair found no evidence of an agreement between the police and any other party to pursue the investigation that led to the seized recording. Finally, the Chair determined that there was no evidence indicating that law enforcement had a special interest in the Commission's case against Judge Knapp. Considering these factors, the Chair concluded that Judge Knapp "failed to establish that the police were improperly motivated to illegally seize evidence to benefit [these] civil proceedings."

We determine that the Chair's application of the *Sheetz* factors to the evidence in this case was not clearly erroneous and ascribe no error to her denial of Judge Knapp's motion. We overrule Judge Knapp's exception to the Chair's decision to deny his motion in limine.

9

Having addressed Judge Knapp's preliminary exceptions, we turn to the Commission's findings of fact and conclusions of law, Judge Knapp's exceptions to the same, and our disposition.

## II

## Standard of Review

"In reviewing the Commission's findings of facts, we accept the Commission's findings as *prima facie* correct, and will only disturb the Commission's factual findings to the extent they are clearly erroneous." *In re Ademiluyi*, 488 Md. 45, 88 (2024) (quoting *In re Nickerson*, 473 Md. 509, 518 (2021)). "When reviewing the Commission's legal conclusions, we independently review the record to determine whether the Commission's decision is supported by clear and convincing evidence." *Id.* (quoting *In re Nickerson*, 473 Md. at 527).

The Commission's findings of fact are organized, for the most part, in a general chronological order. After its chronological findings, the Commission makes findings of fact concerning specific categories of misconduct—engaging in conduct that manifests bias, improperly commenting on pending cases, and breaching confidentiality of Commission matters. We summarize the Commission's findings of fact in the same general format as used by the Commission.

## III

## The Commission's Findings of Fact

### A. General Background

Judge Knapp earned his bachelor's degree from Brown University in 1966 with a major in history and economics. He subsequently graduated from Columbia University

10

with a master's degree in business administration, having majored in finance. Judge Knapp worked for almost 40 years in the financial industry, at an executive level, on matters involving financial risk and contracts. After retiring from the finance industry in 2007, Judge Knapp started law school in 2010 at 66 years of age. He passed the Maryland bar examination in 2014 and became a licensed Maryland attorney. Judge Knapp volunteered his time and experience to assist clients with early-stage businesses in the Small Business Administration's SCORE program.[7]

## B. *General Chronology of Events*

Judge Knapp learned about the Orphans' Court for Anne Arundel County in 2018 when he received a flyer on Election Day. He decided to run for election and campaigned with another candidate for judge of the Orphans' Court, David Duba. Judge Vickie Gipson, an incumbent on the Orphans' Court, was also running.

Judge Knapp, Judge Duba, and Judge Gipson were elected to the Orphans' Court for Anne Arundel County in the November 2022 election. Judge Knapp was the only judge who was licensed to practice law in Maryland. Judge Gipson was licensed to practice law in the District of Columbia and Pennsylvania. Judge Duba was a full-time high school teacher. After they were sworn in as Orphans' Court judges, the Governor appointed Judge Gipson to be the Chief Judge of that court.

---

[7] SCORE is the former Service Corps of Retired Executives program.

The three judges shared one space for their office chambers, with each judge having their own desk. The desks were arranged in a triangular shape, and the chambers was adjacent to a small kitchenette area.

After "going along" with his colleagues for approximately six to eight weeks, tensions arose between Judge Knapp and Chief Judge Gipson over decisions and opinion drafting. Judge Knapp described Chief Judge Gipson's writing as "us[ing] English words[,]" but not "English sentences." Judge Knapp decided that it was his responsibility to take what Chief Judge Gipson wrote and "put it into English." Judge Knapp characterized changes that Chief Judge Gipson made to orders and decisions that he drafted as "plagiarism." Judge Knapp shared his frustration concerning Chief Judge Gipson's writing with Judge Duba.

In the spring of 2023, clashes over decisions and writing styles morphed into shouting loud enough to be heard outside chambers, which, according to the testimony of Judge Duba, drew "the attention of members of the Register of Wills [office] or the public." At one point, according to Judge Knapp, staff in the Register of Wills Office came and told them to "cool it." During his testimony before the Commission, Judge Knapp acknowledged that he and Chief Judge Gipson were told on at least two occasions that they could be heard in the area where the staff of the Register of Wills met with the public. On reflection, Judge Knapp told the Commission that these episodes made him "fe[el] like an asshole[.]"

Judge Duba testified that he found Judge Knapp's conduct and manner of interacting with Chief Judge Gipson during this period to be rude, antagonistic, and adversarial. Judge

12

Duba described an incident in chambers in which Judge Knapp approached Chief Judge Gipson, leaned over her desk while she was seated, and stated that he did not respect her.

The Commission found that Judge Knapp was overly argumentative with Chief Judge Gipson in public hearings. By way of example, the Commission pointed to a colloquy between the judges during a status hearing in an estate case, in which Judge Knapp argued with Chief Judge Gipson about whether funds paid to an interested person pursuant to a life insurance policy had to be repaid to the estate.[8]

---

[8] During the Commission proceeding, recordings of certain estate proceedings were admitted into evidence. In its findings, the Commission referenced the following exchange between Chief Judge Gipson and Judge Knapp during a status hearing on April 23, 2023 in the *Estate of Cemile Marshall*, Estate No. 87055:

MS. LATORRE:  I guess Jane got a check from the insurance company for my mom. But it was made to her, not to the estate. And that money she used to get the dog.

JUDGE GIPSON:  So then, that's not an estate asset.

JUDGE KNAPP:  Well, was the check payable to Jane as the—

JUDGE GIPSON:  She just said it was paid to Jane.

JUDGE KNAPP:  No, she said she got the check.

JUDGE GIPSON:  She said it came to Jane.

JUDGE KNAPP:  It came to Jane, that's correct. But the check was not necessarily payable to Jane. It just could have been sent to Jane but payable to the estate. If the check was payable—if Jane—

JUDGE GIPSON:  Let's ask the question. Was the check payable to Jane?

13

In the spring of 2023, Judge Knapp's demonstrative disrespect for Chief Judge Gipson continued. Judge Duba scheduled an internal meeting in an attempt to see if the judges could develop a better working relationship and establish office norms. According to Judge Duba, Judge Knapp would not agree to "fundamental things" such as listening to each other, not interrupting one another, and being respectful to one another. The session was considered "a flop" as the judges could not agree on a definition of "acting respectful." Judge Knapp testified that, although he did his "damnedest to deflect," when pressed, he expressed his honest opinion "that Judge Gipson was not a good attorney[,]" adding that at the time, he "still thought she was an attorney." He added further that Chief Judge Gipson "wasn't a good judge," "her writing was woeful" and "she had absolutely zero leadership skills."

Thereafter, Judge Duba suggested that the judges participate in a mediation session at the Anne Arundel Conflict Mediation Center. After the judges cancelled Orphans' Court proceedings to attend the mediation, the session was similarly unsuccessful with Judge Knapp having repeated his criticism of Chief Judge Gipson. Judge Knapp then reached out to Chief Justice Fader's chambers[9] and the Anne Arundel County Department of Human Resources.

From fall 2023 until May 2024, according to Judge Duba, intermittent "fighting" continued. Judge Knapp refused to agree to respect his fellow judges or to listen to them without interrupting.

---

[9] Chief Justice Matthew Fader, of the Supreme Court of Maryland, came to the Anne Arundel County Orphans' Court in early 2023 to meet with the judges. According to Judge Knapp, Chief Justice Fader suggested that the judges get in touch with him if they had any problems.

Disagreements over opinion drafting continued to the point that they were brought to the attention of the Register of Wills. In late August 2023, the court heard a case and took it under advisement. Judge Knapp drafted a dissent to be filed with Chief Judge Gipson's majority opinion. In October 2023, following multiple inquiries about the status of the majority opinion, Judge Knapp walked to Chief Judge Gipson's desk and said, "Vickie, please stop dicking around." Chief Judge Gipson responded that she was still working on it. Describing Chief Judge Gipson's response to his "dicking around" statement as a "metaphorical pearl-clutching moment," Judge Knapp testified that Chief Judge Gipson advised the former Register of Wills that Judge Knapp cursed at her. When Chief Judge Gipson returned to chambers with the former Register of Wills, Judge Knapp repeated the phrase, to which the former Register of Wills "rolled her eyes." Later that day, Judge Knapp went to the clerk's office and learned that Chief Judge Gipson and Judge Duba had signed the opinion and order without notifying him. Upon learning this, he grabbed the document to add his dissent for filing.

Before the Commission, Judge Knapp explained that he did not consider the phrase "dicking around" as cursing at someone. He acknowledged that he could have said, "[s]top dithering please," but added that "we're not in Victorian England."

Fueled by his belief that there was a concerted effort to block his ability to issue dissents and to change the court from a three-judge to a one-judge court, Judge Knapp's failure to cooperate and lack of courtesy continued. To highlight Judge Knapp's failure to cooperate and his lack of courtesy, the Commission's findings refer to several Orphans' Court proceedings in which Judge Knapp and Chief Judge Gipson quarreled with one

15

another on the bench.  We summarize some proceedings as recounted in the Commission's findings of fact.

The case of the *Estate of Marion Wierzbowski*, Estate No. 110664, came before the Orphans' Court on January 9, 2024, on a notice of judicial probate.  After hearing from the litigants, Judge Knapp and Judge Duba agreed that Mr. Wierzbowski would be appointed personal representative.  Chief Judge Gipson advised Mr. Wierzbowski that the first thing that he needed to do was to open a bank account.  Thereafter, Judge Knapp returned to a disagreement that he had earlier with Chief Judge Gipson in the hearing about whether the next step in the estate was to open a bank account or wait to open the bank account until there was cash in the estate:

> JUDGE KNAPP: —let me back up here.  I appreciate you [referring to Chief Judge Gipson] like to interrupt, but no, the first thing is not to open up an estate bank account.  There's no cash in the estate.  You're going to have to put money in to have a bank account open.

After Judge Knapp continued about possible next steps, Chief Judge Gipson concluded the hearing, indicating that the court was "running 'very behind' and that Mr. Wierzbowski would be appointed upon the filing of the necessary paperwork with the Register of Wills."

The court held a hearing in the *Estate of Dorothy Bradford*, Estate No. 108738, on January 9, 2024, on a notice of judicial probate.  One of the issues before the court was whether a copy of the will would be admitted to probate.  Judge Knapp asked a series of questions about the will, and Chief Judge Gipson questioned whether the parties could come to an agreement on the issue.  The Commission found that Judge Knapp was openly

16

hostile to Chief Judge Gipson and responded rudely after perceiving that Chief Judge Gipson had interrupted his questioning:

> JUDGE GIPSON:   So the problem is, is that the copies are defective, significantly so.
>
> MS. LINDA BRADFORD:  Okay.
>
> JUDGE GIPSON:  So, we need to have an original.
>
> MS. LINDA BRADFORD:  Okay.
>
> JUDGE KNAPP:  Okay.  Excuse me.  We have a difference of opinion on the Court as to the admissibility of the copies.
>
> MS. LINDA BRADFORD:  Okay.
>
> JUDGE KNAPP:  *So, that was one judge's opinion.  It is not this judge's opinion.*
>
> * * *
>
> JUDGE KNAPP:  Okay.  And you have no other siblings?
>
> MS. LINDA BRADFORD:  No.
>
> JUDGE KNAPP:  Okay.
>
> JUDGE GIPSON:  Let me ask a question.  So, is there any objection to reaching a family agreement similar to what's in the will?  Do you have any objection to that?  Is there somehow—
>
> JUDGE KNAPP:  Before we get there—
>
> JUDGE GIPSON:  No, I —actually, I asked a question.
>
> JUDGE KNAPP:   Yeah, I realize you did, but you—
>
> JUDGE GIPSON:  What is—
>
> JUDGE KNAPP:  —You jumped in before I finished my questioning.  Thank you, Judge Gipson.

17

* * *

JUDGE GIPSON:  So, what I heard you say was that it was a copy of a copy, and I heard the other Ms. Bradford say the same thing, which is significant. So, it's not really a copy of the will, it is a copy of a copy.

Mr. BERMAN [Attorney]:  That is correct, your honor.

JUDGE GIPSON:  Okay.  So, on that basis, I would say it's inadmissible.

JUDGE KNAPP:  *Okay, again, one judge's opinion*.

* * *

JUDGE GIPSON: … So, I kind of would like for you guys to have some— to take a second and see if you can't have some discussion among yourselves to see if you can reach a conclusion as to how you'd like to handle it.  Because I'd rather come up with a conclusion that you can live with rather than us dominating and imposing our decision on you.  Would that—

JUDGE KNAPP:  Okay—go ahead.

JUDGE GIPSON:  Would that be something that you would consider doing?

MS. LINDA BRADFORD:  I will take it under consideration.

JUDGE GIPSON:  Okay.

JUDGE KNAPP:  Okay.  *I would also just like to point out that, like it or not, I believe my colleague essentially put some pressure on you to come up with an agreement with your sister.  And I would urge you to ignore any feelings that you might have that you're doing that for the benefit of the Court because you are not.  I understand that you do not care for your sister.  That's fine.*

MS. LINDA BRADFORD:  It's not that I don't care for her.  It's just—

JUDGE KNAPP:  Whatever it is.  Okay.  You don't want to have to—you don't want to have to deal with her on that issue.  That's fine.

MS. LINDA BRADFORD:  Financially, we don't see eye to eye—

JUDGE KNAPP:  That's cool.

18

MS. LINDA BRADFORD:  —financial responsibilities.  I love my sister.  She's my sister, so—

JUDGE KNAPP:  Okay.  But you don't want to work with her on this.

* * *

JUDGE KNAPP:  *And before we leave, again I will kind of reiterate what I said before referencing my colleague's sort of paternalistic leaning on you to play nice with your sister.  If you do not feel comfortable that you can—that it[']s going to be effective working with your sister, hold your ground.  Do not go along with that simply because my colleague would like you to do that, okay.*  I mean, it would be one thing, again, if, instead of your sister being co-personal representative, if Mr. Berman were.  Now, I mean, that is an alternative that you may want to consider.  And again, whether he is willing to do that, don't know.  Of course, he has to get paid.  *But again, simply because my colleague has instructed you to play nice with your sister, that is not a legal position*.  That is not something you necessarily have to do.  And if you do not—and if you feel, for whatever reason, that you're not going to be comfortable in that role, don't do it.

On April 25, 2024,[10] Judge Knapp and Chief Judge Gipson got into an argument while in chambers.  The judges intended to discuss a legal issue.  Several witnesses who were present for this exchange testified before the Commission: Judge Duba; Georges Hetherington, a law clerk; Cody Henson, a building security guard whom Chief Judge Gipson requested be present in chambers; and Judge Knapp.

On hearing the argument from an adjacent room, Mr. Hetherington entered the judges' chambers and saw Judge Knapp approaching Chief Judge Gipson, who was seated.  Judge Duba testified that Chief Judge Gipson repeatedly asked Judge Knapp to back away from her and not get any closer.  According to Mr. Hetherington, Judge Knapp ignored

---

[10] The Commission notes that this incident occurred on April 23, 2024.  Testimony at the hearing confirms that it occurred on April 25, 2024.

Chief Judge Gipson, stood over her, and got "in her face." Mr. Henson testified that he saw Judge Knapp approach Chief Judge Gipson being "extremely like loud, over the top, you know." Judge Knapp acknowledged that he asked Chief Judge Gipson if she was afraid of him, to which she responded, "yes." Judge Knapp then stated to Mr. Henson, "If I hit her, you can shoot me."

Before the Commission, Judge Knapp attempted to minimize the incident, in terms of both how close he was in proximity to Chief Judge Gipson, as well as what he said to Mr. Henson:

> And so I walked over and, you know, leaned over the table, you know, in [Chief Judge Gipson's] general proximity…. And then she said, 'Get away,' you know, something. 'Go away.' You know, I rolled my eyes and said something like, you know, 'Why? Are you afraid of me?' You know, and she said yes. And so, I, you know, straightened up, you know, as rapidly as I could, which is none too rapid at all. You know, and as I backed away, I said to the guard in a totally facetious and sarcastic manner, you know, 'If I touch her, you can shoot me.'

The judges continued to have hearings, with contentious exchanges among them. According to Mr. Henson, who was in the courtroom during hearings, Judge Knapp was unprofessional and addressed Chief Judge Gipson in an insulting way "almost every time" he was in the courtroom. Mr. Hetherington described similar behavior, and Judge Duba stated that, at times, he could see the reactions of the public upon witnessing Judge Knapp's behavior.

On May 2, 2024, the court heard two cases, *Estate of Emma Izzard*, Estate No. 90447, and *Estate of Shirley D. Allen*, Estate No. 111278. The Commission found that Judge Knapp was rude and unprofessional both on the bench and in chambers.

In *Estate of Emma Izzard*, Judge Knapp suggested that Chief Judge Gipson did not care about the outcome of an issue that was before the court, and suggested that the court would not be able to return to the case in the future if that was needed. The matter was before the court on a petition filed by Rose Carter in which she sought approval to purchase real property and related issues. Chief Judge Gipson and Judge Duba agreed to approve Ms. Carter's purchase. Judge Knapp disagreed with the decision, indicating that the court should have permitted a purchase by anyone who wanted to purchase the property, not limited to Ms. Carter. The following colloquy ensued:

> JUDGE GIPSON: So, to add clarity to what Judge Knapp has shared, the petition is on behalf of Ms. Rose Carter, and that's what we are approving. Should it become necessary at some point in the future to sell it to someone else for whatever the reason where Ms. Rose Carter is not part of that transaction, we will consider that at the time. You can just write a line or something like that and we'll take that into consideration. It's not a big deal. But I think that, out of respect for the fact that she submitted the petition, that the approval should be for the purchase for her.

> JUDGE KNAPP: *Okay. It may not be a big deal to Judge Gipson*, but in the event that there is an offer and there is a time-is-of-the essence thing, you won't get caught up here and—which is why, again, give you the latitude, to act you know, without the Court's permission.[11]

(Emphasis added).

In the *Estate of Shirley Allen*, the Commission also found that Judge Knapp undermined the court. That matter was before the court on a notice of judicial probate and related issues. After hearing from the parties, Chief Judge Gipson suggested that the parties try to settle their dispute. In explaining his disagreement with this suggestion, Judge Knapp said, "[a]nd again,

---

[11] Thereafter, Chief Judge Gipson indicated that the court could act on an emergency request for further relief on an expedited basis.

this is Judge Gipson's position. It is not the position of the Court if we say the Court consists of both of us, okay."

On the same day as the above-referenced proceedings, others witnessed Judge Knapp becoming angry in chambers over his disagreements with Chief Judge Gipson and Judge Duba. Mr. Henson, the security guard stationed in chambers, testified that he saw Judge Knapp, "pacing back and forth," "using a little bit of profanity, and it was intense to a point" where Mr. Henson told Judge Knapp that he would have to write a report about the incident. Upon hearing this, Judge Knapp then invaded the personal space of Mr. Henson and pointed his finger at Mr. Henson—close enough that as Mr. Henson described, Judge Knapp "barely touched him." Chief Judge Gipson told Judge Knapp to "back away."

At the hearing before the Commission, Judge Knapp minimized this incident, describing his behavior toward Mr. Henson as "polite" and stating that they were about an "arm's length apart."

Thereafter, Judge Knapp refused to work in chambers with a security guard present and, instead, worked in the courtroom. Prior to upcoming hearings, Judge Knapp was asked multiple times to leave the courtroom so that the judges could enter together as a group, but he refused to do so.

On May 16, 2024, Judge Knapp remained on the bench and refused to accede to Chief Judge Gipson's request that he not work on the bench before and between hearings. The argument between Judge Knapp and Chief Judge Gipson was so loud that several people in the Register of Wills office heard it, including Deputy Register Karen Recinos,

22

who heard the argument as she sat at her desk assisting the public. Judge Knapp's refusal to leave the bench prompted Chief Judge Gipson to direct that a 911 call be placed to the Anne Arundel County Police Department.

Corporal Brian Cross and Officer Brenden King arrived and entered the courtroom to speak with Judge Knapp after conferring with the other judges in chambers. Both officers were wearing body-worn cameras. The officers attempted to mediate the situation. Corporal Cross offered to move a chair into the conference room so that Judge Knapp could work there. They reminded Judge Knapp that, "when you're a judge, you're in the public eye[.]" Judge Knapp said to the officers, "I'm perfectly ok[ay] with the public catching on to the crap that goes on in this court. . . . Is there a statute that [says] I have to walk in with the others? . . . [T]his court is non-functioning." He also acknowledged being aware of Chief Judge Gipson's complaints against him, stating that he had not yet done something, but "now is the time."

As the situation continued, a supervisory officer, Lieutenant Cox, arrived. On the body camera footage, Lieutenant Cox explained that he was there because the matter "deal[t] with judges[,]" and he "needed to be [there] as a supervisor." Lieutenant Cox pointed out that there were "plenty of other calls for service" in the county that he could be addressing, but instead, he was at the Orphans' Court. According to the footage from Lieutenant Cox's body-worn camera, Lieutenant Cox indicated to Judge Knapp that he appeared frustrated and angry, to which Judge Knapp agreed. The body-worn camera footage also shows Lieutenant Cox asking Judge Knapp about Judge Duba's characterization of his behavior as "aggressive." Again, Judge Knapp confirmed that he

23

was aggressive insofar as he was trying to make his points in the "face of continual interruptions." After confirming with Judge Knapp that he had a hearing and was supposed to be on the bench, Lieutenant Cox encouraged Judge Knapp to "move forward" with the hearing. Lieutenant Cox asked whether the judges had tried mediation. Officer King reminded Judge Knapp that his position as a judge is "one of the most professional occupations in the county."

Later, Judge Knapp repeatedly minimized the May 16, 2024, incident. In a judicial peace order proceeding that occurred on May 21, 2024 (discussed in more detail below), when describing the incident during direct testimony under oath, Judge Knapp mentioned why he was working in the courtroom, but failed to fully describe his role in the standoff or that the police had been called. In his deposition before the Commission, Judge Knapp failed to mention that he made a comment to an attorney who was sitting in the courtroom in which he mentioned that he was working in the courtroom because he did not want to work in the presence of a security guard.

On May 20, 2024, Chief Judge Gipson filed a petition for a peace order in the District Court of Maryland, sitting in Anne Arundel County. The District Court held a temporary peace order hearing on May 21, 2024. Orphans' Court hearings were again canceled for the day. All three judges testified at the temporary peace order hearing.

During the May 21 temporary peace order hearing, Judge Knapp made it clear that he would not obey what he perceived as an order from Chief Judge Gipson. Concerning the incident in which he approached Chief Judge Gipson and was asked to back away,

24

Judge Knapp admitted that he refused to do so, characterizing the requests as "orders" that

he refused to follow:

> THE COURT:  Well, you were talking about being asked to leave on the—I
> think it was the 13th.
>
> JUDGE KNAPP:  Overall, again, this is an issue of Judge Gipson feeling she
> has the authority to order me around.  The testimony was when I approached
> her, it wasn't that she asked me not to come closer to her.  She ordered me to
> come—not to come closer to her.  She testified that—
>
> THE COURT:  I mean, whether it was asking or ordering, I mean, don't you
> think at that point you want to stop approaching her?
>
> JUDGE KNAPP:  It doesn't—
>
> THE COURT:  Doesn't she have a right to her personal space?
>
> JUDGE KNAPP:  Your Honor, it's gotten to the point where I am so sensitive
> to her ordering me to do things because of her high handedness, because of
> the way she deals with me, and deals with my work, that it's a touch point,
> and it's a flash point.  And so am I going to do anything to her physically?
> No.  Am I going to obey what I perceive as an order from her?  No.

The District Court granted Chief Judge Gipson a temporary peace order against

Judge Knapp, finding that there were "reasonable grounds to believe" that Judge Knapp

had harassed Chief Judge Gipson.  The order identified Judge Knapp and Chief Judge

Gipson as Maryland judges, "both elected officials who serve together on the Orphans'

Court for Anne Arundel County."  (Citation modified).  The order restricted Chief Judge

Gipson's and Judge Knapp's contact with each other, including during deliberations.

Specifically, the District Court ordered that

> [a]ll contact between the petitioner and respondent shall be lawful and
> limited to the performance of their official duties, including presiding over[]
> court sessions and deliberating on decisions or opin[ion]s.  No in person

contact between petitioner and respondent shall occur without third parties present which may include facility security.

(All caps removed from original). Judge Knapp was also ordered not to harass Chief Judge Gipson or commit acts of "misuse of telephone facilities or equipment," or "misuse of electronic communication or interactive computer service[,]" in addition to other standard provisions in the peace order. The order was in effect until June 3, and later extended.

After the temporary peace order hearing, Judge Knapp refused to speak with Judge Duba and Mr. Hetherington because they had been present at the hearing and willing to testify. Judge Knapp told them that "seeing as how the two of you are prepared to testify against me and want to send me to jail, there's now a barbed wire fence in between us, you're on one side, I'm on the other, you're my enemy now, don't talk to me."

On May 21 and 30, 2024, Investigative Counsel sent Judge Knapp "Notice of Investigation" letters and reminded him of his preservation and confidentiality obligations.[12]

---

[12] Investigative Counsel's letters dated May 21, 2024, and May 30, 2024, told Judge Knapp to

> [p]lease also consider this a formal reminder of your obligation to preserve any and all records or evidence that could be relevant to this investigation, including but not limited to any documents, notes, files, memoranda, correspondence, photographs, statements, electronic records, emails, text messages, or other materials whether paper, electronic or otherwise stored. This communication and all future communication and information related to this investigation shall be confidential in accordance with [Maryland] Rule 18-407.

(Emphasis omitted).

26

On June 3, 2024, the temporary peace order was extended through June 24, 2024, and a final protective order hearing was scheduled for June 24, 2024. Thereafter, Judge Knapp continued making sarcastic comments at the Orphans' Court about Judge Duba's and Chief Judge Gipson's contentions at the peace order hearing. For example, on June 4, 2024, Judge Knapp said, "I hope I'm not too close to you and you don't feel threatened by me standing near your desk."

On June 4, 2024—despite having been ordered not to harass Chief Judge Gipson or misuse telephone facilities or electronic communication—Judge Knapp started using his cell phone to record the court's confidential judicial deliberations between Chief Judge Gipson, Judge Duba, and himself. Judge Knapp did not obtain consent from the individuals present during the deliberations before recording them on his cell phone, as required by Section 10-402 of the Courts and Judicial Proceedings Article of the Maryland Code. For these deliberations, Ms. Cheek and Mr. Hetherington were also present and did not consent to being recorded. The audio-recording of the confidential deliberations that Judge Knapp made was admitted into evidence before the Commission under seal. As discussed below, the audio recording of the June 4 proceeding was deleted by Judge Knapp in the presence of Anne Arundel County police officers on June 20, 2024. The officers were at the court to seize Judge Knapp's phone due to complaints that he was recording individuals without their consent. The deleted recording was recovered by Detective Michael Krok, who testified before the Commission as an expert for Investigative Counsel.

27

On June 11, 2024, Judge Knapp told Chief Judge Gipson and Judge Duba that he was making recordings of them in chambers and held out his phone to show them.[13] The other judges told him that they did not consent to being recorded. Judge Duba believed, at that point, that Judge Knapp did not stop recording.

On June 13, 2024, Assistant Attorney General Mark H. Weisner told Judge Knapp via email that recording conversations without the express consent of all persons who were being recorded was illegal, and to "refrain" from doing so:

Good evening, Judge Knapp—

It has come to my attention that you have attempted to record several conversations while in the Orphans' Court/Register of Wills offices. Please be advised that in Maryland it is illegal to record a conversation without the express consent of all individuals involved. Md. Code Ann., Cts. & Jud. Proc. § 10-402(c)(3).

In the future, please refrain from recording any conversation unless every party to the conversation has consented. If an individual asks you to stop recording, please honor that request. Thank you.

Mark

Despite the admonition from the Attorney General's Office, Judge Knapp continued to record. On June 18 and 20, 2024, according to Judge Duba's testimony, Judge Knapp stated, "I'm recording while I'm speaking, don't talk while I'm speaking, and I'll pause the recording when it's your turn to talk."

---

[13] According to Judge Duba, Judge Knapp's purpose in making the recordings was that "he thought we were twisting his words and he wanted to record himself speaking in particular to capture his own words so they couldn't be twisted or used against him."

On June 20, 2024, Chief Judge Gipson placed a second 911 call, this time to report that Judge Knapp had violated the temporary peace order by recording conversations on his cell phone without consent. Corporal Joseph Mastros, Sergeant Heather Whittaker, and Corporal Juan Fuentes of the Anne Arundel County Police Department responded to the Orphans' Court, and interviewed Judge Knapp, among others. All three officers were wearing body-worn cameras.

Thereafter, Judge Knapp, in the presence of the police, knowingly and intentionally deleted from his cell phone the recordings that he made of his colleagues. Initially, to Corporal Mastros, Judge Knapp minimized the significance of the recordings, telling Corporal Mastros that he had recordings on his phone that predated his being told that he could not record, that the recordings were of himself, and that when he stopped talking, he paused or stopped the recording. Body camera footage reflects the following colloquy:

> JUDGE KNAPP: I get it. I understand. And actually—and I have those recordings.
>
> CPL. MASTROS: Okay.
>
> JUDGE KNAPP: So, and what I'm recording is me.
>
> CPL. MASTROS: Gotcha.
>
> JUDGE KNAPP: And I advised them that I'm—because they said they don't want to be recorded—
>
> CPL. MASTROS: Mm-hmm.
>
> JUDGE KNAPP: —or at least Judge Gipson. And so, I advise them when I'm talking. I'm clear about it. When I stop talking, I pause the or stop the recording: I'm not sure what I'm doing, but turning it off . . .

When Corporal Mastros told Judge Knapp that his cell phone was going to be seized, Judge Knapp told him he could not do so, and said the "allegation was absolutely nonsense":

> CPL. MASTROS: Basically, with, like the allegations though, I am going to have to seize the phone. All right.
>
> JUDGE KNAPP: Seize my phone?
>
> CPL. MASTROS: Yes.
>
> JUDGE KNAPP: No, you can't . . .
>
> CPL. MASTROS: But it's just with this allegation and everything like that, we have to handle it as strict to policy as possible, okay.
>
> JUDGE KNAPP: Okay. Yeah. Again, I mean, there are recordings on here, before I was advised that I cannot record, okay . . .
>
> CPL. MASTROS: All right. If you want to talk to my sergeant about why we're seizing it, that's fine.
>
> JUDGE KNAPP: Yeah, yeah. Again, because, you know, I would be more than happy to play the recordings that were done. You know, that's fine. And you know, and so maybe that'll help. But you know, this allegation is absolutely nonsense . . .
>
> * * *
>
> CPL. MASTROS: So, I'll get my sergeant to come in here. That way—
>
> JUDGE KNAPP: Yeah. Okay. Yeah. Because, again, these are—you know, there's an accusation of doing this, which is it's flat-out not true.

While awaiting the arrival of Corporal Mastros' sergeant, Judge Knapp suggested that the charge was "false," and that the seizure could be avoided, and that he had "nothing to hide":

30

JUDGE KNAPP:  You know, this is—you know, we're talking about a, you know, a serious, serious level of inconvenience—

JUDGE KNAPP:  —because of a false charge, okay . . .

JUDGE KNAPP:  Maybe then we can avoid the phone seizure stuff, okay . . .

JUDGE KNAPP:  Nothing to hide here.

Once Sergeant Whittaker arrived to address the phone seizure, Judge Knapp admitted to having "a whole bunch of recordings[,]" suggested that the recordings "in question would be the ones from today," and that one from June 11 "didn't count":

JUDGE KNAPP:  Okay, Yeah, *I mean, there are a whole bunch of recordings on here.*

SGT. WHITTAKER:  Okay.

JUDGE KNAPP: *I mean, the ones in question now would be the ones today, right?  So, this one over here, the 11th, that doesn't count.  Okay*.  That was—

SGT. WHITTAKER:  So—

JUDGE KNAPP: —that was before anybody said, "You can't record."  So, today's recordings, just so that we can—because you guys take this phone away and I'm really going to be screwed, so—

SGT. WHITTAKER: Okay.  So let me stop you right there.  Are you willing to let us look through all of these recordings?

JUDGE KNAPP:  Yeah, Oh yeah.  Absolutely.

(Emphasis added).

After Sergeant Whittaker planned next steps to review the recordings, she told Judge Knapp that the recordings she needed to see were not limited to that day.  Judge Knapp then admitted he had a recording from June 4:

31

JUDGE KNAPP: Yeah. And again, there's a series of recordings today.

SGT. WHITTAKER: So, it isn't just going to be today, sir, because the issue is, is that, regardless of whether or not someone said you were okay with them being recorded, it's still against the law to film or record someone without their consent.

JUDGE KNAPP: Okay.

SGT. WHITTAKER: So, if you didn't ask them their consent prior to today's date, it's still unlawful. So we need to look at all the recordings, I believe—

JUDGE KNAPP: That's fine.

SGT. WHITTAKER: —starting from the week of the 11th.

JUDGE KNAPP: Okay. That's fine. *Okay. So, the ones here dated June 4th, you don't care about, right?*

SGT. WHITTAKER: Well, are they here and are you recording people without their consent, that would be my question.

JUDGE KNAPP: These were recorded here, but June—again, these were— the county attorney—

SGT. WHITTAKER: Maybe we should start with that. Okay.

JUDGE KNAPP: —the county attorney sent me a memo.[14] I forget the date of it. We could—

SGT. WHITTAKER: June 13th.

JUDGE KNAPP: June 13th, okay. Whatever it was. And after that memo, receipt of that memo—

SGT. WHITTAKER: Okay.

---

[14] Although Judge Knapp refers to his receiving a memo from the county attorney about recording individuals, it appears that he is referring to the June 13, 2024 email that he received from Assistant Attorney General Mark H. Weisner.

JUDGE KNAPP:  —then, you know, okay, I was advised that, you know, recording people before that, not allowed.  I'm not totally sure what these recordings are.  You know, but if this is a private matter, get rid of them.

(Emphasis added)

Sergeant Whittaker asked Judge Knapp when the peace order was served on him.

Corporal Mastros advised it was on June 3.  Judge Knapp then admitted that he understood

that under the temporary peace order, he was prohibited from using "electronic stuff":

SGT.  WHITTAKER: So, [the peace order was served on] June 3rd.

JUDGE KNAPP:  June 3rd.

SGT. WHITTAKER:  *So, we would be interested in any recordings from June 3rd on because the peace order stipulates that you can't use—what's the word?*

JUDGE KNAPP:  *Electronic stuff.*

SGT WHITTAKER:  Yeah, the electronic stuff.  So, anything—

JUDGE KNAPP:  Okay.

SGT. WHITTAKER:  —from June 3rd on is what we would be interested in.  So, if you're willing to play all those videos for us, that would be great.

JUDGE KNAPP:  Yeah, Let's do it.

\* \* \*

SGT. WHITTAKER: And that will be evidence for us.

JUDGE KNAPP:  Okay.  Let's do it.  I mean, these are audio.

SGT. WHITTAKER:  Okay.  So, if you don't mind just setting your phone down so we can view what you're looking at?

JUDGE KNAPP:  Okay.  Here.  These are phone calls, right.

SGT.  WHITTAKER:  Right

33

JUDGE KNAPP:  Okay.  How do we do this?

SGT.  WHITTAKER:  How long are these recordings?

JUDGE KNAPP:  I don't know.  They're short.  These are today, right?

SGT. WHITTAKER:  Not just today, though, you understand?

(Emphasis added).

After Sergeant Whittaker clarified that she wanted all the recordings, Judge Knapp

admitted to having deleted some:

> JUDGE KNAPP:  I—you know, *recordings from before today, I got rid of, okay, so—because you know, I was told, "You can't do it," so I didn't do it because I got rid of them, okay.  So, I don't have those*.

> \* \* \*

> SGT WHITTAKER:  Okay.  Do you mind if I scroll through these?  Because—

> JUDGE KNAPP:  No.

> SGT. WHITTAKER:  Okay.

> SGT. WHITTAKER: Because you literally just had videos on here from—

> JUDGE KNAPP:  No, no, no.  These are all recordings, only audio.

> SGT.  WHITTAKER:  I don't mean videos, I'm sorry.

> JUDGE KNAPP:  Audio.

> SGT. WHITTAKER:  I mean audio recordings from different days other than today.  You just said—

> JUDGE KNAPP:  Yeah.

> SGT. WHITTAKER: *—the 6th, the 3rd.  So, what happened to those?  Like, in the last couple of minutes, what happened to those?*

34

JUDGE KNAPP:  *I might have deleted those.  You know.*

SGT. WHITTAKER:  *Like just now, while you're talking to us, you deleted them?*

JUDGE KNAPP: *Yeah, yeah.  I mean, these are—*

SGT.  WHITTAKER:  Okay.  So, we're going to take your phone.

CPL. MASTROS:  Yeah.[15]

SGT. WHITTAKER:  And I'm sorry, but you can't delete evidence while we're sitting here talking—

(Emphasis added).

On June 21, 2024, when Judge Knapp was served with the search warrant for his cell phone and the statement of charges filed by the Anne Arundel County Police Department, he admitted that he had "got rid of five recordings," suggesting he could show them to police because they were "in the recycle bin."  Judge Knapp later admitted that after the June 20, 2024, seizure of his cell phone, and while it was in police custody, he attempted to access its contents remotely.

The Commission found that Judge Knapp's statements and testimony about the extent to which he had deleted the recordings made before June 20, 2024 (including those from June 4 and June 18) were not credible, and varied from (1) admitting to the police on June 20 that he had deleted recordings, (2) asserting that the recordings did not contain anything other than "mere seconds of silence," (3) claiming the recordings were not "material or relevant," and (4) denying that he destroyed evidence at all.

---

[15] At this point, Sergeant Whittaker handed Judge Knapp's cell phone to Corporal Mastros.

The Commission found that Judge Knapp's deletions of, or attempts to delete, audio recordings also constituted a failure to cooperate with Investigative Counsel. Judge Knapp had been repeatedly reminded of his obligation to preserve "all records that could be relevant to the investigation[.]" The Commission determined that the audio recordings were relevant to Investigative Counsel's investigation, in that they may demonstrate (1) whether Judge Knapp violated the law by recording his colleagues without their permission, (2) whether Judge Knapp violated the temporary peace order, and (3) how he interacted with his colleagues in carrying out the business of the court. Thus, the Commission concluded that, by deleting or attempting to delete audio recordings from his cell phone, Judge Knapp failed to abide by his obligation to preserve the recordings, and thereby failed to cooperate with Investigative Counsel.

## C. The Commission's Findings of Fact Related to Bias

The Commission found that during his tenure, Judge Knapp exhibited racial and gender bias, particularly toward women of color, as well as bias toward those of other nationalities. In making this finding, the Commission referenced the testimony of Judge Duba, Mr. Hetherington, Tameka Smith, Mr. Henson, and an exchange between Corporal Fuentes and Judge Knapp that was captured on Corporal Fuentes' body worn camera.

The Commission credited the following testimony of Judge Duba, which it referenced in its findings of fact:

> [INVESTIGATIVE COUNSEL]: …. What manifestations of implicit bias did you observe Judge Knapp exhibit with regard to people of color?
>
> [JUDGE DUBA]: So, I mean, just, of course, two years of comments directed at Judge Gipson that were, you know, rude or sarcastic or, you know,

36

intentionally divisive or seeking to just—I forget the word I used earlier, but not aggressive, I wouldn't always say. But just kind of going up toward that, getting—always seeking conflict and deriding.

* * *

[INVESTIGATIVE COUNSEL]: At any point did Judge Knapp's demeanor change when he was dealing with or interacting with people of color versus people who were not people of color?

[JUDGE DUBA]: Judge Knapp would choose to get along with some and then choose to be in more of a state of conflict with others. I observed him disproportionately being in a state of conflict or disagreement with people of color. That's what I observed.

Judge Knapp told Judge Duba that the Diversity, Equity, and Inclusion training offered or required by the Judiciary was not relevant to their jobs on the Orphans' Court. According to Tameka Smith, Assistant Chief Deputy Register of Wills, a woman of color, "no encounter" with Judge Knapp was "pleasant." On another occasion, when Ms. Smith had agreed to serve temporarily as the interim Chief Deputy of the Register of Wills, Judge Knapp asked Ms. Smith, "how does it feel to finally be important?" Ms. Smith testified that she was hurt, felt disrespected, and responded to Judge Knapp that she had "always been important." Before the Commission, Judge Knapp minimized Ms. Smith's statement that no encounter with him was pleasant by suggesting that "[t]here is no requirement that a judge be pleasant."

The Commission found that Judge Knapp's behavior was not limited to women of color. The Commission referred to the exchange on May 2, 2024, that occurred in chambers in which Judge Knapp questioned the authority of Mr. Henson, the security guard, who is a person of color. After Judge Knapp approached Mr. Henson and pointed

37

a finger at him, Chief Judge Gipson told Judge Knapp to back away. Judge Knapp then asked Mr. Henson, "[c]an you give me a list of words, you know, that you are going to find offensive so that I don't utter them in your presence again?" Judge Knapp then mentioned George Carlin, and asked Mr. Henson if those were the words Mr. Henson would "find offensive" and questioned whether Mr. Henson was too young to remember George Carlin.

After Mr. Hetherington drafted some proceeding notes for the Orphans' Court, Judge Knapp critiqued his writing, and suggested a change that, in Judge Knapp's words, would make Mr. Hetherington's writing appear "more like an English speaker." Mr. Hetherington testified, "I consider myself to be an English speaker, although I am bilingual." Of Judge Knapp, Mr. Hetherington said, "I've never experienced, and I've worked with a few judges before and I've never really seen that in the judiciary in Maryland . . . ." (capitalization omitted).

On June 20, 2024, after his phone had been seized, the Commission found that Judge Knapp denigrated the Orphans' Court, Chief Judge Gipson, and other nationalities to Corporal Fuentes. After Corporal Fuentes commented on Judge Knapp's coffee cup, noting that it was "interesting," Judge Knapp mentioned that it was from Prague, and that he used to live there and work there for a while. The Commission then referenced the following exchange that was captured on Corporal Fuentes' body worn camera:

> JUDGE KNAPP: . . . But, I mean, one of things that was true in the Czech Republic, true in Slovakia, that was . . . their language skills are not great. And by that I mean, in this country, you hear somebody speaking English but, you know, they don't really—haven't nailed it. You know, maybe it could be somewhat our country, you know, maybe, you know some guy that grew up in, you know, some ghetto area, whatever, where you know, there are immigrants. But you can figure it out. And I think people here are kind

38

of used to that, at least the, you know, people that I've encountered. And so, you know, they deal with people whose English is not top of the line.

CPL. FUENTES: Mm-hmm.

### D. The Commission's Findings Related to Public Comments on Pending Cases and Breach of Confidentiality of Commission Matters

On May 21, 2024, May 30, 2024, and July 9, 2024, Judge Knapp was reminded of his obligation to maintain Investigative Counsel's investigation of the complaints against him confidential. Specifically, he was told, "[t]his and all future communications and information related to this investigation shall be confidential in accordance with Rule 18-407."

On July 26, 2024, the Baltimore Banner ran a column by Rick Hutzell titled "Orphans court ugliness is a sign that Maryland needs to abolish it." The column stated:

> Even standing outside an Annapolis courtroom for a hearing on a protective order that [C]hief Orphans Court Judge Vicki[e] Gipson sought against him, Knapp was defiant that she was the problem. He accused her of being incompetent, and in cahoots with others who filed complaints. 'I signed up to do this job,' he said. 'Judge Gipson doesn't want me to. Screw her.'

Based upon excerpts of Judge Knapp's deposition taken by Investigative Counsel on August 25, 2025, portions of which were admitted and read into the record of the Commission, the Commission found that Judge Knapp admitted making the statements attributed to him in Mr. Hutzell's column.[16]

---

[16] The Commission relied upon the following testimony from Judge Knapp's deposition. After initially stating that he could not specifically recall whether he made the statement, he stated that he would "stand by that statement." When Investigative Counsel followed up by asking whether he denied making the statement, Judge Knapp stated:

On September 18, 2024, the Capital Gazette ran an article by Luke Parker titled "Second criminal case dropped against Anne Arundel Orphans' Court judge." The article stated:

> On Tuesday, after his case was dropped, Knapp said he suspects the three judges' relationship will be strained if he returns to the probate court. However, he said allowing dissents would 'get rid of a lot of the tension.'

Based upon Judge Knapp's deposition testimony that was read into the record, the Commission found that Judge Knapp did not deny making the statement.

## IV

### Judge Knapp's Exceptions to the Commission's Findings of Fact

Before we turn to the Commission's conclusions of law, we take up Judge Knapp's exceptions to the Commission's findings of fact. As discussed above, in judicial disability proceedings we conduct an independent review of the record and "determine whether the charges against the respondent are supported by clear and convincing evidence and which, if any, Rules have been violated." *In re Russell*, 464 Md. 390, 412–13 (2019) (citation modified) (quoting *In re Lamdin*, 404 Md. 631, 637 (2008)); *see also In re Ademiluyi*, 488 Md. 45, 88 (2024); *In re Diener & Broccolino*, 268 Md. 659, 682 (1973); *In re Foster*, 271 Md. 449, 470 (1974).

In conducting our independent review, however, we apply deference to the fact-finding determinations of the Commission. In *Russell*, we explained that "although the Commission's report is only advisory," the Court "should give full consideration to it,

No. I neither deny nor specifically confirm it, but I trust that—you know, I don't know for sure, but I have every expectation that Rick Hutzell is an honest reporter and that he is, you know, reporting. If he said that I said it, or he took notes, okay.

40

particularly with respect to the credibility of the witnesses, where the testimony is conflicting." 464 Md. at 413 (citation modified) (quoting *In re Bennett*, 301 Md. 517, 530 (1984)). We further explained that, in reviewing exceptions by a judge in a judicial discipline proceeding, "[t]he Commission, like the hearing judge in [an] analogous setting of Attorney Grievance Commission proceedings, must 'pick and choose what evidence to believe.'" *In re Russell*, 464 Md. at 419 (quoting *Attorney Grievance Comm'n v. Woolery*, 462 Md. 209, 230 (2018)). Because the "Commission [is] in the best position to evaluate [the witnesses'] demeanor[,]" *id.* (quoting *In re Lamdin*, 404 Md. at 655), "we accept the Commission's findings of fact as prima facie correct and will only disturb those findings to the extent that they are clearly erroneous." *In re Ademiluyi*, 488 Md. at 88 (citation modified) (quoting *In re Nickerson*, 473 Md. at 518); *accord In re Russell*, 464 Md. at 413; *In re Lamdin*, 404 Md. at 637.

### A. Exceptions Rooted in Witness Credibility Assessments

As noted above, Judge Knapp filed 24 exceptions to the Commission's fact-finding. Most of his exceptions involve findings in which the Commission chose to credit the testimony of a witness or a number of witnesses over Judge Knapp's account or characterization of events. Judge Knapp contends that the Commission erred by failing to accept his version of the facts, or his characterization of the same, over the accounts of other witnesses. We determine that the following exceptions are rooted in demeanor and credibility determinations that underpin the Commission's findings:

Exception 1. Judge Knapp was not entirely candid about his conduct.

Exception 2. Judge Knapp was not credible regarding his deletion of audio

41

recordings he had made of his colleagues' without their consent.

Exception 5.   Judge Knapp campaigned with David Duba, and that together, they took the lead in campaigning.

Exception 6.   Judge Knapp approached Chief Judge Gipson during an argument, leaned over the desk at which she was seated, and stated that he did not respect her.

Exception 7.   Judge Knapp would not agree to "fundamental things such as listening to each other, not interrupting, and being respectful."

Exception 9.   Judge Knapp "was openly hostile to Chief Judge Gipson and responded rudely when" Judge Knapp "perceived she interrupted his questioning."

Exception 10. Judge Knapp used the work "fuck" in chambers.

Exception 11. Judge Knapp "got in the face" of Chief Judge Gipson or was extremely loud or threatening toward Chief Judge Gipson.

Exception 12. Judge Knapp undermined the Orphans' Court.

Exception 13. Judge Knapp refused to work in chambers with a security guard present.

Exception 14. The date the argument between the judges was overheard by the Deputy Register of Wills, Karen Recinos.

Exception 15. The Commission's use of the phrase "breadth of" Judge Knapp's "comments" to the attorney sitting in the courtroom on May 16, 2024.

Exception 17. After the temporary peace order hearing, Judge Knapp "continued to make sarcastic comments."

Exception 18. Judge Knapp "started using his cell phone to record the court's confidential deliberations between him, Chief Judge Gipson and Judge Duba."

Exception 19. Judge Knapp "knowingly and intentionally deleted from his cell phone the recordings that he made of his colleagues."

42

Exception 20. Judge Knapp's statements and his testimony about the recordings were not credible.

Exception 21. Judge Knapp "exhibited racial and gender bias, particularly towards women of color, as well as towards those of other nationalities."

Exception 22. Judge Knapp's statement to Judge Duba that Diversity, Equity, and Inclusion training offered by the Judiciary was not relevant to their jobs on the Orphans' Court.

Exception 24. Judge Knapp's suggested edit to Mr. Hetherington's work so that his writing would appear "more like an English speaker" was suggestive of racial basis.

Having conducted an independent review of the record, we overrule these exceptions as they all involve findings that were based upon the Commission's witness credibility determinations, which we determine were not clearly erroneous. In some instances, the Commission commented on Judge Knapp's own inconsistencies in his testimony and statements. In other instances, the Commission credited the testimony of another witness or witnesses over Judge Knapp's testimony. We highlight some of these credibility assessments below.

*Deliberate Attempts to Delete Recordings*

With respect to Judge Knapp's deletion of audio recordings while in the presence of Sergeant Whittaker, the Commission found that Judge Knapp's testimony about the extent to which he deleted recordings prior to June 20, 2024 was simply not credible. The Commission noted that his account varied—from admitting that he had deleted the recordings, to claiming that the recordings contained nothing more than "mere seconds of silence," or were not "material or relevant," to denying that he had deleted them at all. The Commission's credibility findings regarding the recordings deleted by Judge Knapp are

43

amply supported by the record. Most critically, Judge Knapp *admitted* to deleting recordings *during* his June 20, 2024 police interview—conduct that was directly observed and confronted by Sergeant Whittaker and captured on body-worn camera footage.

In his exceptions, Judge Knapp does not dispute that he deleted the recordings. Instead, he contends that the act of deletion transferred them to the phone's "recycle bin," where he was able to recover them and found them to be blank. Even if that were the case, one audio file that had significant content—the June 4, 2024, recording—was not produced by Judge Knapp, but rather recovered by the police detective in the forensics unit who extracted it from the cell phone. The recovered June 4, 2024, recording from Judge Knapp's phone that was admitted into evidence contained the voices of Judge Knapp's colleagues, who did not consent to be recorded. The officer who recovered the recording testified as an expert witness for Investigative Counsel. Judge Knapp offered no expert testimony regarding the contents of his phone or to counter the testimony of the police detective.

The Commission was entitled to credit the police officers' body-worn camera footage, as well as the police officers' testimony, and Judge Knapp's own conflicting statements and testimony, to find that Judge Knapp deliberately destroyed evidence. The record supports the Commission's finding that Judge Knapp was not candid and that his representations were not credible.

*Conduct Exhibiting Bias*

The Commission's findings that Judge Knapp's conduct exhibited racial and gender bias, particularly to women of color, as well as bias toward other nationalities, are based upon the testimony of witnesses whom the Commission found to be credible: Judge Duba,

44

Mr. Hetherington, Ms. Smith, and Mr. Henson. When Judge Duba was asked whether he observed that "Judge Knapp's demeanor change[d] when he was dealing with or interacting with people of color versus people who were not people of color[,]" the Commission credited Judge Duba's response that "Judge Knapp would choose to get along with some and then choose to be more in a state of conflict with others. I observed him disproportionately being in a state of conflict or disagreement with people of color. That's what I observed." The Commission also credited Ms. Smith's testimony that "no encounter" with Judge Knapp was "pleasant" and her description that she felt hurt and disrespected when he asked her how it felt to "finally be important" when she was serving temporarily as the Chief of the Deputy of Wills. The Commission similarly credited Mr. Hetherington's characterization of Judge Knapp's comment that his suggested edit of Mr. Hetherington's proceeding notes would make Mr. Hetherington's writing appear "more like an English speaker"—a comment that Mr. Hetherington, who is bilingual, found offensive. And the Commission credited Judge Duba's testimony that Judge Knapp told him that the diversity training offered by the Judiciary was "not relevant to their jobs."

Of course, bias may be explicit, but it may also be implicit, meaning behavior that is largely influenced by subconscious associations and judgments without prompting. *See Belton v. State*, 483 Md. 523, 549–50 n.14 (2023) (discussing implicit bias); *see also Harford Mem'l Hosp., Inc. v. Jones*, 264 Md. App. 520, 542 (2025) (observing that judicial bias "is not limited to explicit or overt expressions of bias"). The Commission was entitled to credit the testimony of Judge Knapp's colleague, Judge Duba, as well as others who interacted with him in the courthouse, and determine, based on that testimony, that Judge

45

Knapp's words and conduct could reasonably create an appearance of bias toward women and persons of color or different national origins than his own.

*Findings Related to Inter-Office Relationships and Other Conduct*

The Commission similarly credited the testimony of witnesses such as Judge Duba, Mr. Hetherington, Mr. Henson, Ms. Smith, and Ms. Recinos with respect to their findings that Judge Knapp (1) told Chief Judge Gipson that he did not respect her, (2) was openly hostile to Chief Judge Gipson, (3) "got in" Chief Judge Gipson's "face," (4) would not agree to "fundamental things such as listening to each other, not interrupting, and being respectful"; (5) undermined the court; and (6) continued to make sarcastic comments to colleagues after the temporary peace order hearing. Mr. Henson, who was in the courtroom during hearings, testified that Judge Knapp was unprofessional and addressed Chief Judge Gipson in an insulting way "almost every time" he was in the courtroom. Mr. Hetherington described similar behavior, and Judge Duba stated that, at times, he observed the public's reactions upon witnessing Judge Knapp's behavior. The Commission also relied upon the transcripts of Orphans' Court proceedings, which reflect Judge Knapp's interjecting unnecessary and unprofessional comments that undermined Chief Judge Gipson and the court.

The Commission similarly credited Judge Duba's testimony: (1) that Judge Knapp leaned over Chief Judge Gipson's desk while she was seated and stated that he did not respect her; (2) that Judge Knapp used profanity in the Orphans' Court building, including the word "fuck"; and (3) that Judge Knapp made sarcastic comments after the temporary peace order hearing

46

Multiple witnesses testified about the April 25, 2024, incident between Chief Judge Gipson and Judge Knapp during which Chief Judge Gipson was seated, and Judge Knapp approached her and ignored her repeated requests to back away. Mr. Hetherington testified that Judge Knapp "got in her face." Mr. Henson described Judge Knapp as "extremely loud, over the top." Judge Duba testified that Chief Judge Gipson stated that she was afraid of Judge Knapp. And indeed, Judge Knapp admitted that (1) he approached Chief Judge Gipson, (2) she asked him to back away, (3) he perceived her directive to be an "order" that he "refused to obey," and (4) he told the security guard that if he "hit her," the security guard could "shoot" him. Judge Knapp characterizes the latter statement as being facetious and sarcastic. Under the circumstances—a tense and heated workplace exchange—this statement does not become innocuous by virtue of its supposed attempt at sarcasm. The Commission was entitled to credit the above testimony and to reject Judge Knapp's characterizations.

In some instances, the Commission's finding was based upon conflicts in Judge Knapp's own testimony or statements in the record. For example, with respect to the Commission's finding that Judge Knapp failed to mention the "breadth" of his comments to the attorney who was present in the courtroom when he refused to leave the bench, the Commission contrasted Judge Knapp's testimony: (1) before the Commission, in which Judge Knapp testified that he and the attorney exchanged pleasantries; and (2) his testimony in the District Court at the temporary peace order hearing, in which he testified that when the attorney came in, he explained to the attorney that there was a guard in the other room whose presence made him uncomfortable.

47

The Commission also relied on the police officers' body-worn camera footage that captured Judge Knapp's behavior, and statements that he made to law enforcement concerning the court's operations and his colleagues. For example, on June 20, 2024, after the police seized his cell phone, Judge Knapp made the following statement to Corporal Fuentes, which is captured on Corporal Fuentes's body-worn camera:

> JUDGE KNAPP: You know, we spend more time signing things than we actually spend hearing things. *And most of the things that we sign we don't even read.* You know, so this one, I'm not even sure why I am bothering to read it because it has two signatures on it already and that's what it needs, so. I could just sign it, read it, or whatever. Just—you know how the court system here works. . . . *Just so you know, for what it's worth, so, so far this month I've signed 269 things, of which I read 32.*
>
> CPL. FUENTES: 269 documents?
>
> JUDGE KNAPP: And it's like, similar numbers every month. *You know, it's a system which makes, really, no sense.*
>
>           \* \* \*
>
> JUDGE KNAPP: You know what this is all about is Judge Gipson wants me off the court. So, it's—all of this is just her effort to do that. And so, she filed complaints against me in the District Court, she filed complaints against me at some judicial thing.… But again, this is just her trying to get me off the court. And, you know, she thinks she has the authority to order me around, which you know, we're all elected to the same position. And so, that's one of her, you know, big issues, is that she orders me around and I basically say, screw yourself, I'm not gonna. Anyway, that's what this is all about.

(Emphasis added). The Commission found that the above statements denigrated Chief Judge Gipson and the operations of the Orphans' Court in general. The Commission was entitled to credit statements captured by police body-worn cameras over Judge Knapp's counter-narrative and characterization of the evidence.

48

### B. *Other Exceptions Not Involving Witness Credibility Determinations*

We next address Judge Knapp's exceptions that are not based upon credibility determinations. In exception 3, Judge Knapp excepts to the Commission's finding that the "the Chief Judge has the 'full power and authority' to 'act as chief judge.'" In that sentence, the Commission quoted the statutory description of the authority of a chief judge of an Orphans' Court. *See* Md. Code Ann., Est. & Trusts § 2-107. We overrule Judge Knapp's exception. The Commission accurately quoted the statute.

In exception 4, Judge Knapp excepts to the Commission's finding that "[d]uring all relevant times, the Anne Arundel County Orphans' Court sat on Tuesdays and Thursdays from 10:00 a.m. to 3:00 p.m." In support of his exception, Judge Knapp states that during the time in which Judge Duba was on the court, he "was a full-time high school teacher in Prince George's County and was unable to arrive until 11:15 a.m. during the school year which meant that hearings did not begin until 11:30 or later." We overrule Judge Knapp's exception. The Commission's findings refer to the Orphans' Court's general hours in which the court sat, which was based upon the testimony of both Judge Duba and Judge Knapp.

In exception 8, Judge Knapp excepts to the Commission's finding that the use of the phrase "dicking around" was inappropriate. According to Judge Knapp, "[h]is use of the phrase 'dicking around,' while perhaps rudely colloquial, was not wholly inappropriate in chambers." We disagree and overrule his exception. We agree with the Commission that the phrase "dicking around" is not an appropriate phrase to use in a workplace within the Judiciary.

49

In exception 13, Judge Knapp does not dispute that he refused to work in chambers with a security guard present—he asserts that it happened only once. We overrule his exception. Even if it happened only once, it happened all the same.

In exception 14, Judge Knapp excepts to the date that Deputy Register of Wills Karen Recinos heard Judge Knapp and Chief Judge Gipson arguing. He does not dispute that it occurred—he simply contends that it happened on another date. The date that the Commission relied upon is consistent with Ms. Recinos's testimony. Judge Knapp did not refute Ms. Recinos's testimony at the hearing. We overrule his exception.

Turning to exception 16, Judge Knapp excepts to the "suggestion" in the Commission's findings that Chief Judge Gipson had the authority to "order" him around. We overrule Judge Knapp's exception. Judge Knapp's exception refers to the incident in May 2024—which was the subject of the temporary peace order hearing—in which Judge Knapp approached Chief Judge Gipson and was asked to back away. As we read the Commission's findings, the Commission did not characterize Chief Judge Gipson's request as an "order"—Judge Knapp did. Indeed, the Commission quoted Judge Knapp's testimony at the temporary peace order hearing when, in response to the court's question whether Chief Judge Gipson had "a right to her personal space," Judge Knapp's response was that he would not "do anything to her physically" but he would not "obey what [he] perceive[d] as an order from her."

Finally, we address exception 23 in which Judge Knapp excepts to the Commission's findings that reference Judge Knapp's discussion of the comedian George Carlin as evidencing racial, gender, or age bias. To recap, Mr. Henson testified that on

50

May 2, 2024, during a court recess in which the judges were in chambers with Mr. Henson, Judge Knapp was "pacing back and forth," and "using a little bit of profanity and it was intense to the point" that Mr. Henson told Judge Knapp that he was going to have to write him up. Judge Knapp then approached Mr. Henson and pointed a finger at him inches from his chest. Mr. Henson said something to Judge Knapp about not using profanity, and Judge Knapp replied that Mr. Henson should "write a list of things that [Judge Knapp] could say, something like that. And it was just some intense words, and that's about it." Mr. Henson testified that he "didn't really have a problem" with Judge Knapp confronting him because it caused Judge Knapp and Chief Judge Gipson not to confront each other.

Judge Knapp addressed this incident in his testimony before the Commission. He testified that he had used the word "bullshit," which, in Judge Knapp's view, is a "nice terse, get-to-the-point word." In response to Mr. Henson's admonition that he was going to have to file a report, Judge Knapp asked Mr. Henson if he could provide a list of words that he would find offensive, so he would not utter them in his presence again. Judge Knapp said that he then "made some sort of crack" about George Carlin and his "routine about the seven words you can't say on the radio." When Judge Knapp asked him if "those [were] the words," he got no answer and so he walked away.

Based upon our review, including the accounts of both Mr. Henson and Judge Knapp, we cannot say that Judge Knapp's reference to George Carlin is evidence of racial or age bias. Although Mr. Carlin's now-famous monologue met the definition of indecent

51

language, *see FCC v. Pacifica Found.*, 438 U.S. 726 (1978),[17] it did not contain any racial slurs, nor could Judge Knapp's reference to the monologue be considered evidence of racial bias. To be sure, Judge Knapp's conduct on May 2 fell woefully beneath the standards of what is acceptable workplace behavior within the Judiciary, but we cannot say that it reflected evidence of racial or age bias. We therefore sustain Judge Knapp's exception 23.

Aside from the above-referenced exception, we determine that the Commission's findings of fact are not clearly erroneous and therefore, we overrule Judge Knapp's exceptions.

## V

### Conclusions of Law

### Rule 18-101.1.  Compliance with the Law

Maryland Rule 18-101.1 states that "[a] judge shall comply with the law, including this Code of Judicial Conduct." The Commission determined that a host of Judge Knapp's misconduct constituted a violation of Maryland Rule 18-101.1. Given that this rule

---

[17] In 1973, the humorist George Carlin delivered his 12-minute monologue "Filthy Words." *George Carlin*, Filthy Words, on *Occupation: Foole* (Little David Records & Atlantic Records 1973). In the routine, Mr. Carlin satirized the regulatory power of the Federal Communications Commission by commenting on the seven "words you couldn't say on the public airwaves," then "list[ed] those words and repeat[ed] them over and over again in a variety of colloquialisms." *See FCC v. Pacifica Found.*, 438 U.S. 726, 729 (1978). The routine was recorded and played on various radio stations in the ensuing weeks. In response to at least one complaint about the broadcast, the FCC issued a declaratory order, finding Mr. Carlin's language "patently offensive" and expressing the view that it "should be regulated by principles analogous to those found in the law of nuisance 'where the law generally speaks to channeling behavior more than actually prohibiting it.'" *Id.* at 731 (citation modified). On appeal, the U.S. Supreme Court upheld the FCC's action. *Id.* The Court appended Mr. Carlin's monologue in relevant part to its *Pacifica* opinion. *See id.* at 751–55.

overlaps with others, we discuss it in the context of other rule violations. Suffice it to say, the Commission's conclusion that Judge Knapp's misconduct clearly violated Rule 18-101.1 is supported by clear and convincing evidence, and we overrule his exceptions to the contrary.

### Rule 18-101.2.  Promoting Confidence in the Judiciary[18]

At the time of Judge Knapp's misconduct, Maryland Rule 18-101.2 stated:

(a)    **Promoting public confidence.** — A judge shall act at all times in a manner that promotes public confidence in the independence, integrity, and impartiality of the judiciary.

(b)    **Avoiding perception of impropriety.** — A judge shall avoid conduct that would create in reasonable minds a perception of impropriety.

The Commission found by clear and convincing evidence that Judge Knapp engaged in the following sanctionable conduct in violation of Rules 18.101 and 18.101.2:  (1) engaging in loud arguments with a judicial colleague that were heard by Register of Wills staff and the public; (2) being rude and confrontational to a judicial colleague during hearings before the public and in chambers; (3) making disparaging statements about the Judiciary, the Orphans' Court and a judicial colleague to the public, law enforcement, and the media; (4) violating a temporary peace order; (5) breaching the confidentiality of

---

[18] On June 26, 2025, this Court adopted an amendment to Maryland Rule 18.101.2, effective October 1, 2025, which, among other things, added a new subsection (c) as follows:

**(c) Avoiding perception of bias.** — A judge shall avoid conduct that would create in reasonable minds a perception that the judge is acting with bias based on race, sex, gender, religion, national origin, ethnicity, disability, age, sexual orientation, marital status, socioeconomic status, or political affiliation.

53

judicial deliberations by recording them; (6) recording judicial colleagues and staff without their knowledge and/or consent; (7) failing to cooperate during the Commission's investigative process; (8) making negative comments, some very demeaning and with a raised voice, to staff and judicial colleagues, including mocking others' work product, educational level, competence, and intelligence; (9) engaging in aggressive behavior, including invading personal space and refusing to retreat upon request; (10) using unprofessional language, including profanity, in the courthouse, as well as in written communications; and (11) failing to cooperate with colleagues to promote confidence in the Judiciary.

Judge Knapp has filed exceptions to these conclusions of law. However, we observe that for the most part, they rely on the same exceptions that he made to the Commission's findings of fact. And most of his contentions require that we determine that the Commission's findings of fact were clearly erroneous because the Commission failed to accept Judge Knapp's counternarrative. As discussed above, we decline to do so. Based upon our independent review of the record, we determine that there is clear and convincing evidence to support the conclusion that Judge Knapp engaged in the above-described sanctionable conduct in violation of Rules 18-101.1 and 18-101.2 and we overrule Judge Knapp's exceptions.

We will start with what we consider to be the headliner in Judge Knapp's lineup of misconduct—his deliberate attempt to delete audio recordings in the presence of law enforcement as the officers confronted him about allegations that he was recording conversations with his colleagues without obtaining their consent.

Returning to the Commission's findings of fact, the Commission found that Judge Knapp recorded confidential deliberations of the Orphans' Court without the other judges' consent on June 4, 2024, and later made, in Judge Knapp's words, "a whole bunch of recordings" of conversations without their consent. The Commission further found that, after being advised by the Attorney General's Office on June 13 that it was illegal to make such a recording without consent, he had "knowingly and intentionally" deleted such recordings, including the June 4 recording, from his cell phone while being questioned by police officers on June 20, 2024. The Commission concluded that Judge Knapp had "destroyed evidence" and "failed to cooperate with law enforcement as well as the Commission." And, as previously discussed, the Commission found that Judge Knapp's testimony concerning the deletion of the recordings on his cell phone was inconsistent and not credible. We have overruled Judge Knapp's fact-based exceptions, including that he did not delete these recordings in the police's presence on June 20, 2024, as found by the Commission. We similarly overrule his exception as such conduct violates Rules 18-101.1 and 18-101.2.

A judge who knowingly and intentionally destroys evidence in the presence of law enforcement engages in unlawful, sanctionable conduct that does not promote public confidence in the integrity of the Judiciary—full stop. One expects a judge—at any level—to have and to demonstrate respect for the law. Deliberately destroying records or evidence and being untruthful to law enforcement officers conducting a lawful investigation are incompatible with the role of a judge. Such conduct is antithetical to acting in a manner that promotes the public's trust and confidence in the integrity of the Judiciary.

55

Unsurprisingly, we easily conclude that such reprehensible conduct violates the Maryland Code of Judicial Conduct.

Before we turn to Judge Knapp's other exceptions, we make a general observation. Judge Knapp essentially asks us to look at each instance of conduct in isolation and determine whether that conduct constitutes "sanctionable conduct." We do not undertake our review in such a manner. Some of Judge Knapp's conduct might not be viewed as sanctionable conduct if considered in isolation. For example, if a judge raises his or her voice, disagrees with a colleague on or off the bench using language or tones that could be considered discourteous or rude, expresses frustration about a colleague, or utters a profane word or phrase on a bad day, it might not rise to the level of sanctionable conduct. Judges are human and the Maryland Code of Judicial Conduct does not require perfection. However, although each incident viewed in isolation may not, in and of itself, constitute sanctionable conduct, when the conduct evidences a pattern or course of conduct that reflects a lack of professionalism, patience, dignity, courteousness and cooperation that is required of a judge, we will not hesitate to find sanctionable conduct. *See In re Ademiluyi*, 488 Md. at 109 (finding sanctionable conduct where judge "engag[ed] in a pattern of behavior demonstrating a lack of patience, dignity, courteousness, and cooperation required of a judge"); *In re Russell*, 464 Md. at 430 n.21 (finding sanctionable conduct where individual instances of conflict "would likely not amount to sanctionable conduct[,]" but when "[t]aken together," the judge's action reflected an "unyielding pattern of . . . conduct" that "fostered a toxic environment in the District Court"). Here, Judge Knapp exhibited a pattern or course of unprofessional, discourteous conduct throughout his time

56

on the Orphans' Court that supplies the foundation for our conclusion that he engaged in sanctionable conduct.

Returning to Judge Knapp's exceptions to our conclusion that he violated Rules 18-101.1 and 18-101.2, in several of them, Judge Knapp does not disagree that the conduct occurred—he simply objects to the characterization of the conduct, or objects to matters that he perceives as factual errors that, even if true, would have no bearing on the conclusion that the conduct violates the Maryland Judicial Code of Conduct. For example, although Judge Knapp excepts to the conclusion that he engaged in loud arguments, he characterizes them as "spirited" and explains that these "loud discussions only occurred on a few occasions." Even if we were to accept Judge Knapp's alternative version, it would not excuse the violation of the Rules: judges engaging in loud disagreements within the earshot of the public are not engaging in behavior conducive to promoting public confidence in the integrity of the Judiciary. Judge Knapp asserts that he was not rude and confrontational. There is clear and convincing evidence that he was rude and confrontational not only to his judicial colleagues on and off the bench, but also to Mr. Henson and staff in the Register of Wills Office.

Regarding the conclusion that Judge Knapp made disparaging comments about the Judiciary, Orphans' Court, and a judicial colleague to the public and the media, Judge Knapp "agrees that he could have been more judicious when making comments of his fellow judges while on the bench." That said, Judge Knapp argues that when he was speaking with law enforcement and the press, he was simply defending himself in the context of civil or criminal actions brought by Chief Judge Gipson—who, in Judge

Knapp's words, is the "judicial officer who brought the trials and tribulations of the Orphans' court into the public light." Confining our conclusions of law to Judge Knapp's misconduct,[19] we disagree and overrule his exception. Judge Knapp's comments cannot be characterized as simply defending himself. Although we will not recount every negative statement Judge Knapp made in this record that erodes public confidence in the Judiciary, we touch upon a few.

When the police were called to the Orphans' Court on May 16, 2024—because Judge Knapp refused to leave the bench so that the members of the court could walk in together—law enforcement officers reminded Judge Knapp about the importance of his role as a judge and that he was "in the public eye." Judge Knapp replied that he was "perfectly okay with the public catching onto the crap that goes on in this court" and adding that the "court is non-functioning." On June 20, 2024, after his phone was seized, when Corporal Fuentes was attempting to make general conversation with Judge Knapp, Judge Knapp (1) volunteered that he only read 32 of the 269 documents that he had signed that month, (2) stated that the "system makes no sense," and (3) described his conflicts with Chief Judge Gipson, stating, "she thinks she has the authority to order me around," and "I basically say screw yourself. I'm not gonna." Judge Knapp told a reporter that Chief Judge Gipson is "incompetent and in cahoots with others who filed complaints," adding that he "signed up to do this job," but that "Judge Gipson doesn't want him to. Screw her."

---

[19] In the context of this judicial disciplinary proceeding, we are confining our review to Judge Knapp's conduct only. Any consideration by this Court of Chief Judge Gipson's conduct will await another proceeding. *See In re Vickie Gipson*, Supreme Court of Maryland, JD No. 2, September Term, 2025.

We agree with the Commission that Judge Knapp's comments go far beyond his characterization of them as simply defending himself in the context of civil or criminal actions brought by Chief Judge Gipson. The above statements, as well as several others like them, undermine public confidence in the Judiciary. To be sure, as noted by the Commission, "a judge . . . may comment on any proceeding in which the judge is a litigant in a non-judicial capacity." Md. Rule 18-102.10(c); *see also* Md. Rule 18-102.10, cmt. [2] ("This Rule does not prohibit a judge from commenting on proceedings in which the judge is a litigant in a personal capacity."). In making the above statements, Judge Knapp went well beyond his personal capacity—he referred to the court, his judicial capacity on the court, the court's Chief Judge, others who worked at the court, and the court's operations.

Judge Knapp excepts to the conclusion that he violated the temporary peace order. His assertion of error is as follows. The temporary peace order was issued on May 21, 2024. Judge Knapp points to the fact that on July 16, 2024, a District Court judge determined that the peace order had been improperly extended beyond the 30 days. Therefore, reasons Judge Knapp, "it was not in effect" when the police were called to the court on June 20, 2024—the date his phone was seized. We overrule Judge Knapp's exception. Regardless of when the temporary peace order expired, we conclude that Judge Knapp's act on June 4, 2024 of surreptitiously recording the judges' confidential deliberations without their consent—which occurred while the temporary peace order was in effect, after Judge Knapp was served and in violation of the terms of said order—constitutes clear and convincing evidence that he violated the peace order.

59

Judge Knapp next excepts to the conclusion that he breached the confidentiality of judicial deliberations by recording them. Judge Knapp's basis for his exception was that the court deliberations were not confidential because a security guard and a judicial intern were present. We overrule Judge Knapp's exception. To recap, Judge Knapp's surreptitious recording of the court's judicial deliberations on June 4 occurred after the police had already been called on one occasion to referee the judges' interpersonal conflict when Judge Knapp refused to leave the bench, and after the incident in which Judge Knapp "got in" Chief Judge Gipson's face, asked if she was afraid of him, and told the security guard, "if I hit her, you can shoot me." Moreover, the terms of the District Court's peace order issued on May 21, 2024 required that there be no in-person contact between Judge Knapp and Chief Judge Gipson without the presence of third parties, including facility security. Based on the unfortunate discord between these individuals, the presence of additional staff (consisting of a law clerk and a security guard) to ensure that the judges acted within bounds of decency when they conducted their deliberations did not breach the confidentiality of those proceedings.

We similarly overrule Judge Knapp's exception that he failed to cooperate with the investigative process. Judge Knapp deleted recordings that were relevant to an ongoing investigation after receiving preservation notices from Investigative Counsel. He also provided information to Investigative Council and the Commission that was inconsistent with previous testimony. Such conduct constitutes a failure to cooperate.

With respect to Judge Knapp's remaining exceptions to the conclusions of law pertaining to these rules, they are based upon factual disputes in which the Commission

60

credited the testimony of other witnesses over Judge Knapp's account, which we have already addressed. Specifically, Judge Knapp excepts to the conclusions that he: (1) recorded judicial colleagues without their consent; (2) deleted or attempted to delete recordings related to an investigation in front of law enforcement officers; (3) made negative comments, some very demeaning and with a raised voice, to staff and judicial colleagues, including mocking others' work product, educational level, competence and intelligence; (4) engaged in aggressive behavior, including invading personal space, and refusing to retreat upon request; (5) used unprofessional language, in the courthouse, as well as in written communications, and (6) failed to cooperate with colleagues to promote confidence in the Judiciary. Inasmuch as we have already concluded that the Commission's factual findings were supported by clear and convincing evidence and are not clearly erroneous, we determine that such conduct violated Rules 18-101.1 and 18-101.2, and we overrule Judge Knapp's exception to these legal conclusions.

### Rule 18-102.3. Bias, prejudice, and harassment

Rule 18-102.3 states:

(a) A judge shall perform the duties of judicial office, including administrative duties, without bias or prejudice.

(b) In the performance of judicial duties, a judge shall not, by words or conduct, manifest bias, prejudice, or harassment based upon race, sex, gender, religion, national origin, ethnicity, disability, age, sexual orientation, marital status, socioeconomic status, or political affiliation. A judge shall require attorneys in proceedings before the court, court staff, court officials, and others subject to the judge's direction and control to refrain from similar conduct.

(c)     The restrictions of section (b) of this Rule do not preclude judges or attorneys from making legitimate references to the listed factors, or similar factors, when they are relevant to an issue in a proceeding.

Comment [2] to this Rule explains that:

A judge must avoid conduct that may reasonably be perceived as prejudiced or biased.  Examples of manifestations of bias or prejudice include epithets; slurs; demeaning nicknames; negative stereotyping; attempted humor based upon stereotypes; threatening, intimidating, or hostile acts; suggestions of connections between race, ethnicity, or nationality and crime; and irrelevant references to personal characteristics.

As we discussed above, the Commission's finding that Judge Knapp's conduct reflected bias against women and persons of color was based upon the testimony of witnesses that the Commission credited.  Those factual findings were not clearly erroneous.  Accordingly, based upon the testimony of the witnesses credited by the Commission, we agree that Judge Knapp violated Rule 18-102.3 by: (1) telling a judicial colleague that implicit bias training does not apply to the Orphans' Court; (2) minimizing the education and abilities of judicial colleagues to serve on the Orphans' Court; (3) critiquing English language skills of individuals, including suggesting a law clerk's writing should be "more like an English speaker"; and (4) being "in a state of conflict or disagreement" with people of color.  We determine that such conduct could "reasonably be perceived as prejudiced or biased."  Cmt [2].  We overrule Judge Knapp's exceptions to the Commission's conclusion that this conduct violated Rule 18-102.3.

### Rule 18-102.5.  Competence, diligence, and cooperation

Rule 18-102.5(a) requires that a judge "perform judicial and administrative duties competently, diligently, promptly, and without favoritism or nepotism."  The rule requires

cooperation, stating that "[a] judge shall cooperate with other judges and court officials in the administration of court business." Md. Rule 18-102.5(b). Finally "[a] judge shall not willfully fail to comply with administrative rules or reasonable directives of a judge with supervisory authority." Md. Rule 18-102.5(c).

Based upon our independent review of the record, we agree with the Commission that clear and convincing evidence supports that the following conduct by Judge Knapp violated Rule 18-102.5: (1) using inappropriate language, including profanity, in the presence of judicial colleagues and staff; (2) not trying to find common ground or cooperate with his judicial colleagues; (3) failing to competently perform administrative duties, including signing court documents without reading them; (4) willfully failing to comply with reasonable directives of a judge with supervisory authority, such as Chief Judge Gipson's request that Judge Knapp leave the courtroom prior to a hearing so the judges could enter together; (5) refusing to cooperate in the preparation or review of orders; (6) breaching the confidentiality of deliberations by recording them; (7) recording judicial colleagues and staff without their knowledge and/or consent; (8) constructively preventing or discouraging judicial colleagues from deliberating by telling them that they would be recorded if they spoke; (9) failing to fully and meaningfully participate in deliberations; and (10) engaging in loud arguments with a judicial colleague that were heard by Register of Wills staff and the public.

Like almost all of his other exceptions, Judge Knapp's exceptions here are based upon his facts and characterizations of various accounts that were contradicted by other

63

witnesses. The record is replete with clear and convincing evidence that Judge Knapp failed to cooperate with his colleagues, and we overrule his exceptions.

This case is unique from other judicial discipline cases in the sense that it arises in the context of a multi-member court that must deliberate and make decisions collectively. As Judge Knapp correctly notes, each Orphans' Court judge has an equal voice in deliberations and decision-making. A decision of that court requires the endorsement of two judges. And the judges, of course, sit as a panel in a public proceeding in which they must interact with attorneys and counsel who come before them.

We agree with Judge Knapp that, in the course of their work, the judges will not necessarily agree on every matter. That said, there are ways of expressing disagreement on and off the bench without engaging in personal attacks and disparaging one another, using profanity, and invading personal space.

Turning to his specific exceptions that are rooted in particular conduct, Judge Knapp excepts to the conclusion that he refused to cooperate in the preparation or review of orders. He contends that he "only refused to prepare orders when Chief Judge Gipson insisted that she had the authority as Chief Judge to alter his drafts without his consent." He further asserts that the only orders that he "refused to review" were "lengthy ones that Chief Judge Gipson refused to send him electronically." We overrule his exception.

Judge Knapp testified at his deposition, which was admitted into evidence before the Commission, that beginning in June 2023, he refused to draft orders that "would be subject to [Chief] Judge Gipson's unilateral editing, i.e., her plagiarism." Judge Knapp acknowledged that there may have been a time when Chief Judge Gipson "complained"

64

that Judge Knapp was "not holding up [his] end of the workload," to which he told her to "stop . . . unilaterally changing [orders]" and he would "be happy to write stuff." Clearly, it is an understatement to say that there was friction between Chief Judge Gipson and Judge Knapp. And in the context of this case, we are not suggesting that Chief Judge Gipson is free from blame when it comes to the conflict between them, or that all of the blame falls upon Judge Knapp. However, when one accepts a position that is bestowed upon them by the citizens of Anne Arundel County—a position that is the shared responsibility of three individuals—it is paramount that those individuals cooperate with one another on the core functions of the position, such as the preparation of orders. Indeed, the Orphans' Court cannot operate without the cooperation of the judges who serve on it.

We also overrule Judge Knapp's exception to the conclusion that he refused to review orders. The fact that Judge Knapp apparently decided not to read lengthy orders when, in Judge Knapp's words, "Chief Judge Gipson refused to send [them] to him electronically" is, in and of itself, a lack of cooperation. Moreover, Judge Knapp told Corporal Fuentes that he signed 269 documents for the month, and only read 32 of them.

Similarly, we overrule Judge Knapp's exception to the conclusion that he failed to fully and meaningfully participate in deliberations. According to Judge Knapp, he often forcefully participated in the deliberations—indeed, with such apparent forcefulness that his conduct "became the subject of" other charges. The record is replete with clear and convincing evidence that Judge Knapp's conduct impaired, obstructed, and discouraged participation in the deliberative process. Such conduct included: (1) recording judicial

65

deliberations without his colleagues' consent; (2) engaging in combative behavior that resulted in the entry of a temporary peace order that required the presence of a third party, including security, for deliberations and decision-making; and (3) interrupting, not listening to others, and being disrespectful during internal judicial discussions—all of which was described by Judge Duba, who was present for such deliberations. All of this conduct can be described as a lack of full and meaningful participation in deliberations— another core function of a multi-member court that is required to act by a vote of at least two of its members.

Judge Knapp was not required to agree with his colleagues regarding legal rulings in cases before the court. Nor was he required to refrain from stating his opinion on the record in order to avoid the appearance of disagreement. In *In re Russell*, we explained that to maintain judicial temperament,

> a judge need not be constantly affable and loquacious. Judges may engage in genuine disagreements and lively discussions with fellow judges and courthouse staff; and judges may disagree or be incompatible with colleagues. Each case must be considered on its own facts to determine whether a judge's conduct has exceeded the bounds of a permissible judicial temperament.

464 Md. 390, 430 n.21 (2019). Moreover, while a single instance of a judge conflicting with colleagues "would likely not amount to sanctionable conduct[,]" we look at the incidents in the aggregate. *Id.* Here, Judge Knapp exhibited a recurring pattern of discourteous and disrespectful behavior that leads us to conclude that his conduct was sanctionable and violated Rules 18-101.1 and 18-102.5.

66

**Rule 18-102.8.  Decorum, demeanor, and communication with jurors**

Maryland Rule 18-102.8(b) states that:

A judge shall be patient, dignified, and courteous to litigants, jurors, witnesses, attorneys, court staff, court officials, and others with whom the judge deals in an official capacity, and shall require similar conduct of attorneys, court staff, court officials, and others subject to the judge's direction and control.

We agree with the Commission that there is clear and convincing evidence that Judge Knapp violated Rule 18-102.8(b) by: (1) engaging in loud arguments with a judicial colleague that were heard by Register of Wills staff and the public; (2) being rude and confrontational to a judicial colleague during hearings before the public and in chambers; (3) disparaging the court and judicial colleagues; (4) invading personal space and ignoring requests to retreat; (5) recording judicial colleagues and staff without their knowledge and/or consent; (6) making negative and demeaning comments to staff and judicial colleagues; and (7) using unprofessional language, including profanity.

Judge Knapp excepts to the legal conclusion that his conduct violated Rule 18-102.8(b) for the same reasons as his exceptions to other legal conclusions—specifically, that he did not engage in the underlying conduct that supports the rule violation.  We have already overruled his fact-based exceptions and will not recount the reasons again.  We overrule Judge Knapp's exception to the conclusion that his conduct violated Rule 18-102.8(b).  The above conduct exemplifies discourteous behavior.  We expect more from members of the Judiciary at all levels.

## Rule 18-102.16.  Cooperation with Disciplinary Authorities

In any judicial disciplinary proceeding, a judge is required to "cooperate and be candid and honest with" judicial disciplinary agencies.  Md. Rule 18-102.16(a).

We agree with the Commission that clear and convincing evidence supports the conclusion that Judge Knapp violated Rule 18-102.16 by failing to cooperate and be candid and honest with Investigative Counsel and the Commission by deleting and attempting to delete recordings that were the subject of an investigation by the Commission after being reminded in correspondence from Investigative Counsel of his obligation to preserve records and evidence relevant to the investigation.  Like his other exceptions discussed above, Judge Knapp excepts to this conclusion for the same reasons that he excepted to factual findings and other legal conclusions related to the destruction of evidence.  We will not belabor it here.  There is clear and convincing evidence to support the Commission's conclusion that Judge Knapp's conduct in deleting or attempting to delete evidence violated Maryland Rule 18-102.16(a).  We overrule his exception.

Rule 18-102.16(b) states: "A judge shall not retaliate, directly or indirectly against a person known or suspected to have assisted or cooperated with an investigation of a judge or an attorney."  The Commission concluded that Judge Knapp violated Rules 18-101.1 and 18-102.16 by "retaliating against a judicial colleague and staff member [Judge Knapp] knew or suspected had assisted or cooperated in an investigation[.]"  Judge Knapp excepts to this conclusion by stating that his only acts of "retaliation" were "filing complaints against Judge Duba about his persistent failure to attend [c]ourt during statutorily mandated hours and against Chief Judge Gipson for arranging the [c]ourt calendar to match Judge

68

Duba's availability." There is no evidence in the record pertaining to the "complaints" to which Judge Knapp refers. However, commensurate with our de novo review of conclusions of law, we do not find clear and convincing evidence to suggest that Judge Knapp directly or indirectly retaliated against a person known or suspected to have assisted or cooperated with an investigation into judicial misconduct. Turning to the Commission's response to this exception, the Commission directs us to the record in which Judge Duba testified that following the May 21, 2024 temporary protective order hearing, Judge Knapp told Judge Duba and Mr. Hetherington that "there's now a barbed wire fence in between us, you're on one side, I'm on the other, you're my enemy now, don't talk to me[.]" To the extent Judge Knapp's comment is indicative of retaliatory behavior, it was not retaliatory in the sense that it related to the judicial misconduct investigation—rather, it related to Chief Judge Gipson's temporary peace order proceeding. Accordingly, we sustain Judge Knapp's exception insofar as it relates to the Commission's conclusion that he engaged in retaliatory conduct.

# VI

## Disposition

The Maryland Constitution provides that, "[u]pon any recommendation of the Commission, . . . after a hearing and upon a finding of misconduct while in office, or of persistent failure to perform the duties of the office, or of conduct prejudicial to the proper administration of justice," this Court may remove a "judge from office or may censure or otherwise discipline" the judge. Md. Const. art. IV, § 4B(b)(1). Maryland Rule 18-437(f)(1) provides, among other things, that this Court may "impose the disposition

69

recommended by the Commission or any other disposition permitted by law[.]" Although

the Commission's "recommendation is entitled to great weight, the Maryland Constitution

vests this Court with the ultimate authority to impose sanctions on judicial officers." *In re*

*Nickerson*, 473 Md. at 533 (quoting *In re Lamdin*, 404 Md. at 652). The Maryland Code

of Judicial Conduct provides:

> Whether discipline should be imposed should be determined through a
> reasonable and reasoned application of the Rules and should depend upon
> factors such as the seriousness of the transgression, the facts and
> circumstances at the time of the transgression, the extent of any pattern of
> improper activity, whether there have been previous violations, and the effect
> of the improper activity upon the judicial system or others.

Md. Rule 18-100.1(b)(1)(B).

We are guided by the "duty to dispense discipline in a manner that preserves the

integrity and independence of the judiciary and reaffirms, maintains, and restores public

confidence in the administration of justice." *In re Nickerson*, 473 Md. at 533 (citation

modified). In imposing judicial discipline, we aim not to punish, but rather "to discourage

others from engaging in similar conduct and to assure the public that the judiciary will

not condone judicial misconduct." *Id.* "The sanction must inform the public that we

recognize that there has been judicial misconduct, must be sufficient to deter the

offending judge from repeating the conduct in the future, and must be sufficient to deter

others from engaging in similar conduct." *Id.* (citation modified).

"[R]emoving a judge from office is an extraordinary sanction" and "generally

reserved for circumstances where there is no alternative to entering an order of

removal." *Id.* (citation omitted). Although removal is, indeed, extraordinary, this

70

Court has done so on several occasions. *See, e.g.*, *In re Ademiluyi*, 488 Md. at 142 (removing a judge for engaging in conduct that violated a "plethora" of provisions of the MCJC, including: behaving in a manner that lacked patience, dignity and courtesy and failing to maintain the demeanor required of a judge; failing to cooperate with judges in the administration of court business; and failing to comply with reasonable directives of a judge with supervisory authority); *In re Nickerson*, 473 Md. at 530 (removing a judge from the Orphans' Court for Kent County for violating the MCJC, in connection with conduct involving impaired driving resulting in a conviction; her interactions with law enforcement, including mentioning her status as an Orphans' Court judge in an attempt to gain favorable treatment; failing to timely satisfy the conditions of a conditional diversion agreement and failing to provide documentation in accordance with the terms of a private reprimand); *In re Diener & Broccolino*, 268 Md. at 669–70 (removing from office two judges who, while serving as judges of the Traffic Division of the Municipal Court of Baltimore City, "dispos[ed] of parking ticket cases, reach[ed] verdicts of either 'not guilty,' or did suspend and/or reduce fines for reasons that can only be described as friendship, or political favoritism, or the importuning of court clerks") (citation modified); *In re Bennett*, 301 Md. at 519–21 (removing a judge for conduct involving the judge seeking "the favor and political support of" a person who asked him to remove a traffic violation from someone else's driving record, implying that he would attempt to obtain a revised disposition of a guilty verdict entered by another judge, and causing another judge's signature to be forged to change the disposition of a traffic case).

As we observed in *In re Diener and Broccolino*, 268 Md. at 671:

> Precisely what 'conduct prejudicial to the proper administration of justice' is or may be, in any or all circumstances, we shall not undertake to say. Indeed, a comprehensive, universally applicable definition may never evolve but it is unlikely we shall ever have much trouble recognizing and identifying such conduct whenever the constituent facts are presented.

We had no trouble here concluding that Judge Knapp engaged in conduct prejudicial to the administration of justice. Judge Knapp's egregious conduct in intentionally deleting audio recordings in the presence of law enforcement officers who were called to investigate a complaint that he was recording his colleagues during judicial deliberations provides a sufficient basis to warrant his removal. It is antithetical to the rule of law that a judge would attempt to destroy evidence that purportedly evinced his own violations of law. Such conduct is—without a doubt—fundamentally incompatible with judicial office and erodes public confidence and trust in the Judiciary. The public must have assurance that we will not tolerate such intentional and lawless behavior at any level of the Judiciary.

In addition to this egregious violation, this Court also considered Judge Knapp's conduct upon which we found violations of Maryland Rules 18-101.1, 18-101.2, 18-102.3, 18-102.5, 18-102.8(b), and 18-102.16; the seriousness of the conduct; and the impact of the misconduct on the public and the Judiciary. His behavior extended well beyond friction with a colleague, and was apparent to other individuals at the court, members of the public who conducted business before the Register of Wills and appeared before the Orphans' Court, and law enforcement. Judge Knapp engaged in a pattern or course of conduct that reflected discourteous and disrespectful behavior that well exceeded the bounds of judicial temperament and caused significant interference with the operations of the Orphans' Court.

72

The citizens of Anne Arundel County are entitled to a functioning Orphans' Court regardless of its internal dynamics. Judge Knapp's continued service on the Orphans' Court would not have resulted in a court that properly serves the public.

In concluding that removal was the appropriate disposition, the Court considered the mitigating factors the Commission identified: Judge Knapp's lack of prior disciplinary history; character witnesses who described appropriate interactions with Judge Knapp in other settings; and the possibility that some of his professional concerns about his colleagues may have merit. We do not disregard these factors, but they cannot overcome the weight of Judge Knapp's violations. We have no reason to believe that a lesser sanction would have caused Judge Knapp to amend his ways.

For these reasons, we determined that Judge Knapp's removal from office was the only disposition sufficient to preserve the integrity of the Judiciary, and assure the public that the Judiciary will not, and does not, condone such egregious misconduct. For that reason, on June 4, 2026, we issued an order removing Judge Knapp from office.